**Kenneth CHALTRY, Plaintiff,**

v.

**OLLIE'S IDEA, INC., George Freeman, individually and as an officer of Ollie's Idea, Inc., and Laidlaw and Associates, Inc., Defendants.**

**No. M 76–26 CA 2.**

United States District Court, W. D. Michigan, N. D.

June 18, 1982.

Robert C. Greene, U. S. Atty., Grand Rapids, Mich., Allen H. Bean, U. S. Dept. of Labor, Detroit, Mich., for plaintiff.

Paul E. Petosky, pro per.

George A. Freeman, pro per.

Gifford D. Smith, Marquette, Mich., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

MILES, Chief Judge.

The plaintiff, Kenneth Chaltry, brings this action under the Vietnam Era Veterans' Readjustment Assistance Act of 1974, 38 U.S.C. §§ 2021–2026 (1976), against his

former employer, George Freeman, the company which defendant Freeman formed from the assets of his proprietorship, Ollie's Idea, Inc., and the corporation which purchased the assets of Ollie's Idea, Inc., Laidlaw and Associates, Inc. Under the Act, employers, or their successors in interest, are required to restore former employees inducted into the armed forces to their former positions or to positions of like seniority, status, and pay, provided that such employer's circumstances have not so changed as to make reemployment impossible or unreasonable. To be entitled to reinstatement the employee is required to complete his military service satisfactorily, apply for reemployment within ninety (90) days of discharge, and remain qualified for his former position. 38 U.S.C. § 2021 (1976).

Plaintiff Chaltry contends that he was first employed in June, 1970 as a staff announcer at a radio station owned and operated by defendant Freeman. This position allegedly was a non-temporary one which he held until entering the military in July, 1972. In December, 1974, the plaintiff maintains, he received an honorable discharge, and, although he satisfied all other statutory requirements, defendant Ollie's Idea, Inc. refused to reinstate him. He also contends that Laidlaw and Associates, Inc. is liable under the Act as a "successor in interest" to Ollie's Idea, Inc. *See* 38 U.S.C. § 2021(a)(B)(i) (1976).

The court concludes that judgment should be entered in favor of the plaintiff against defendants Ollie's Idea, Inc. and Laidlaw and Associates, Inc., jointly and severally, in the amount of $19,318.16 based on the findings of fact and conclusions of law as set out below. *See* Fed. R. Civ. P. 52(a).

### FINDINGS OF FACT

1. Defendant Ollie's Idea, Inc. (Ollie's) was a Michigan corporation formed on December 14, 1973 and was doing business as radio station WGON–AM and WQXO–FM with an office and place of business in Munising, Michigan.

2. Defendant George Freeman became president of Ollie's on its date of incorporation and held that position until the company sold its assets to Laidlaw and Associates, Inc. (Laidlaw) in 1977. He also held nearly 100% of the stock in Ollie's.

3. Mr. Freeman had been sole proprietor of radio station WGON–AM and WQXO–FM from December, 1969 until December, 1973 when it was incorporated.

4. Defendant Laidlaw, a North Dakota corporation, agreed to purchase the real and personal assets of Ollie's Idea, Inc., exclusive of cash, receivables, and part of the real estate, in March, 1977 and did in fact purchase the same later that year.[1] This transaction was not a sale of corporate stock.

5. Defendant Laidlaw and plaintiff Chaltry have stipulated and agreed that there are no shareholders common to both Ollie's and Laidlaw.

6. Defendant Laidlaw and plaintiff Chaltry further stipulated and agreed that subsequent to Laidlaw's purchase of the station, it continued to operate the station in substantially the same manner with the same equipment. It also continued to employ staff announcers.

7. On July 15, 1981, defendant Laidlaw agreed to sell radio station WGON–AM and WQXO–FM to persons not parties to this suit and did in fact do so the same year.[2]

8. Plaintiff Chaltry, a resident of Marquette, Michigan, was hired by defendant George Freeman to work at the radio station in 1970 as a staff announcer. His responsibilities included playing records, recording commercials, and working with news reports.

---

1. In his proposed findings of fact the plaintiff contends that Ollie's Idea, Inc. sold its assets to Laidlaw and Associates, Inc. on November 1, 1977. There is no evidence on the record, however, to support this allegation.

2. In his closing argument plaintiff's counsel stated that Laidlaw and Associates, Inc. sold its interest in the radio station in late October, 1981. There is no evidence on the record to support this contention.

9. On June 6, 1972, the Selective Service System sent plaintiff an "Order to Report for Induction" requiring him to report July 19, 1972 for forwarding to an armed forces induction station.

10. The plaintiff informed his employer, defendant Freeman, of his draft status shortly after receiving notice in early June.

11. After receiving the notice of induction, the plaintiff requested, and was given, a few weeks off from his job in July, 1972. While away he learned that if he enlisted in the military, rather than be drafted, he could defer his induction for 180 days. He therefore chose to enlist.

12. When plaintiff Chaltry returned to Munising after taking time off, he informed defendant Freeman that he was not required to report for military duty for another six months and that he wanted to remain with the radio station. The defendant responded that the plaintiff was no longer entitled to a position because he had been replaced.[3]

13. After being refused reemployment, the plaintiff contacted the Labor Management Services Administration of the United States Department of Labor (LMSA). Mr. Gregory A. Miksa, a compliance officer with LMSA in 1972, investigated the plaintiff's complaint and ultimately met with the plaintiff and defendant Freeman in September, 1972 in Munising.

14. At this meeting the defendant employer informed the plaintiff for the first time that he had been fired. Prior to this meeting the defendant simply had denied the plaintiff's request to work beyond July, 1972.

15. In a letter dated August 21, 1972 to Louis Woiwode, Area Administrator of the Detroit Area Office of LMSA, defendant Freeman had stated that "[w]hen Ken Chaltry returns from service his job will be waiting for him. He knows this. I've told him so several times." Plaintiff's Ex. 11.

16. At trial defendant Freeman alleged that the plaintiff resigned his position with WGON–AM and WQXO–FM for reasons unrelated to his entering the service. He specifically denied that the plaintiff was on vacation after receiving his draft notice and prior to induction. The defendant also contended that plaintiff Chaltry was actually fired due to poor job performance.

The defendant's inconsistent positions make his testimony on this issue incredible. The record clearly reflects that the plaintiff "resigned" his position at the radio station in anticipation of his military obligation. The court rejects other alternatives for the following reasons: First, there is no evidence to indicate that the plaintiff's allegedly poor job performance warranted dismissal. Second, the plaintiff was not informed that he had been fired until long after his departure when he requested assistance from LMSA. It appears as though the firing explanation was contrived by Mr. Freeman in order to avoid retaining the plaintiff for a few months until he had to report for active duty. Third, in the letter defendant Freeman wrote to Mr. Woiwode he acknowledged a continuing relationship with the plaintiff by stating that the plaintiff would have his job back when he returned from active duty. Finally, there also is evidence that the plaintiff was compensated through the week ending July 27, 1972. This evidence comports with the plaintiff's testimony that he took a two week paid vacation in mid-July. See Plaintiff's Ex. 5.

17. On July 7, 1972 the plaintiff entered the United States Army and was placed on inactive status for 180 days. He began active duty on January 5, 1973 and received an honorable discharge approximately two years later, on December 14, 1974, leaving with the rank of Specialist, Fourth Class.

18. The same month he left the service, the plaintiff returned to Munising and applied for his former position at the radio station. Mr. Paul E. Petosky, Vice President of Ollie's and General Manager of

---

**3.** The plaintiff has made no claim for damages based on defendant Freeman's refusal to retain the plaintiff during this six month period.

station WGON–AM and WQXO–FM, informed plaintiff Chaltry that no openings were available. A few weeks later the station contacted the plaintiff to fill a temporary vacancy. The plaintiff refused this position.

19. The plaintiff's starting salary in 1970 was approximately $1.45 an hour. On or about January 1, 1972, he began receiving a bi-weekly salary of $140.00 and continued to receive this salary until he left for the Army.

20. While employed at the station during this two-year period, plaintiff Chaltry worked between 35 and 40 hours a week.

21. Staff announcers employed by the station subsequent to plaintiff's departure earned at least the federal minimum wage in effect at the time.

22. After being denied reinstatement, the plaintiff made diligent efforts to secure alternative employment to mitigate his damages.

23. Before purchasing WGON–AM and WQXO–FM in 1977, defendant Laidlaw knew, or should have known, of the plaintiff's claim against defendants Freeman and Ollie's. On November 2, 1977, attorney George Wood advised William A. Heigaard, an attorney and principal in Laidlaw during its acquisition of the radio station from Ollie's, that the plaintiff was a creditor of Ollie's with an undetermined claim.

24. After acquiring the station, defendant Laidlaw carried on the operation of the station without substantial change or interruption. It used the same call letters, format, equipment, and offices.

25. The plaintiff and defendant Laidlaw have stipulated and agreed that the federal minimum wage rates[4] from 1977 through 1981 were:

| 1977 | — | $2.30/hour |
|------|---|------------|
| 1978 | — | $2.65/hour |
| 1979 | — | $2.90/hour |
| 1980 | — | $3.10/hour |
| 1981 | — | $3.35/hour |

26. The court takes judicial notice that the federal minimum wage[5] for 1975 was $2.10 per hour and for 1976 it was $2.30 per hour.

27. If the plaintiff had been employed at the station for 37.5 hours a week and had been paid the applicable federal minimum wage for the corresponding years, his annual income would have been:

| Year | Wage Rate | Annual Income |
|------|-----------|---------------|
| 1975 | $2.10/hour | $4,095.00 |
| 1976 | $2.30/hour | $4,485.00 |
| 1977 | $2.30/hour | $4,485.00 |
| 1978 | $2.65/hour | $5,167.50 |
| 1979 | $2.90/hour | $5,655.00 |
| 1980 | $3.10/hour | $6,045.00 |

28. If the plaintiff had been employed for 28 weeks[6] at the station during 1981 and had been paid the applicable federal minimum wage of $3.35 an hour, his annual income would have been $3,517.50.

29. In 1975 the plaintiff was able to secure employment with some logging jobbers and Ironwood Oil Company and earned a total of $1,643.60.

4. The court does not necessarily believe that the minimum wage is the best measure of the plaintiff's damages. These figures assume that during this period the plaintiff never would have gone beyond the minimum pay. Nevertheless, there is no evidence on which to base a greater amount.

5. *See* note 4 *supra.*

6. Laidlaw and Associates, Inc. sold its interest in the station during 1981 and the plaintiff assumes it cannot be liable for the entire year. The plaintiff, however, failed to prove when during 1981 Laidlaw sold its interest. Therefore, for the purposes of damages, the court will assume the station was sold on July 5, 1981, the date on which Laidlaw entered into an agreement of sale. *See* note 2 *supra.*

30. In 1976 the plaintiff was unsuccessful in finding employment.

31. In 1977, the plaintiff was employed with *The Mining Journal,* a Marquette, Michigan newspaper, and earned $1,390.78.

32. In 1978, the plaintiff worked for *The Mining Journal,* Lake States Wood Preserving, and the Upper Peninsula Commission for Area Progress, earning approximately $2,562.50.

33. In 1979, plaintiff Chaltry worked half of the year for the Fish & Wildlife Service of the United States Department of Interior and earned $4,802.49. The other half of the year he attended Northern Michigan University.

34. In 1980, the plaintiff continued to work for the Fish & Wildlife Service earning $5,071.27.

35. In 1981, the plaintiff earned $6,065.14 with the Fish & Wildlife Service.

36. The plaintiff's yearly damages are as follows:

| Year | Projected Income | Actual Income | Yearly Damages |
|---|---|---|---|
| 1975 | $4,095.00 | $1,643.60 | $2,451.40 |
| 1976 | $4,485.00 | –0– | $4,485.00 |
| 1977 | $4,485.00 | $1,390.78 | $3,094.22 |
| 1978 | $5,167.50 | $2,562.50 | $2,605.00 |
| 1979 | $5,655.00 | $4,802.49 | $ 852.51 |
| 1980 | $6,045.00 | $5,071.27 | $ 973.73 |
| 1981 | $3,517.50 | $6,054.14 | –0– |

37. The plaintiff's total damages, including interest amount to $19,318.16, computed as follows:

| Year | Damages | Interest on Current Year's Damages[7] | Interest on Prior Years' Total Accumulated Damages[8] | Total Accumulated Damages |
|---|---|---|---|---|
| 1975 | $2,451.40 | $ 73.54 | –0– | $2,524.94 |
| 1976 | $4,485.00 | $134.55 | $151.50 | $7,295.99 |
| 1977 | $3,094.22 | $ 92.83 | $437.76 | $10,920.80 |
| 1978 | $2,605.00 | $ 78.15 | $655.25 | $14,259.20 |
| 1979 | $ 852.51 | $ 25.58 | $855.55 | $15,992.87 |
| 1980 | $ 973.73 | $ 29.21 | $959.57 | $17,995.35 |
| 1981 | $–0– | $–0– | $1077.32 | $19,032.67 |
| 1982 | $–0– | $–0– | $285.49[9] | $19,318.16 |

## CONCLUSIONS OF LAW

1. Plaintiff Chaltry was "inducted into the Armed Forces of the United States . . . for training and service" within the meaning of the Vietnam Era Veterans' Readjustment Assistance Act of 1974, 38 U.S.C. § 2021(a) (1976).

2. The plaintiff left a position, "other than a temporary position," in order to fulfill his military obligation. *Id.*

7. Interest is computed at 6% as if the damages accrued at midyear.

8. Interest for prior years' total accumulated damages was computed at 6% as if the damages accrued at the end of the year.

9. Interest for 1982 is computed at 6% as if it accrued on March 31, 1982.

3. He also received "a certificate described in section 9(a) of the Military Selective Service Act (relating to the satisfactory completion of military service)" within the meaning of the Act. *Id.* § 2021(a)(1); *See* 50 U.S.C. app. § 459(a) (1976).

4. Within ninety (90) days of receiving the above-mentioned certificate, the plaintiff made application for reemployment. 38 U.S.C. § 2021(a)(2) (1976).

5. Before his military service began, the plaintiff had been in the employ of a private employer and following his discharge he was qualified to perform the duties of his former position. Therefore, he was entitled to "be restored by such employer or the employer's successor in interest to such position or to a position of like seniority, status, and pay" under the Act. *Id.* § 2021(a)(B)(i).

6. Defendant Ollie's is a "successor in interest" to defendant George Freeman, sole proprietor doing business as radio station WGON–AM and WQXO–FM in Munising, Michigan, within the meaning of the Act.[10]

■ 7. Defendant Laidlaw is a "successor in interest" to Ollie's under the Act. The court recognizes that this issue has been addressed by the Sixth Circuit in *Cox v. Feeders Supply Co.,* 344 F.2d 924 (6th Cir. 1965) (per curiam). In *Cox* the plaintiff veteran had been employed with a farm supply company which sold 90% of its inventory to the defendant company while the plaintiff was in the military. When he returned, the plaintiff sought reinstatement from the defendant but was turned down. The court of appeals adopted the district court's reasoning that because there had been " 'no showing of business continuity and plaintiff [had not been] an employee of the defendant prior to his entry into the armed forces he [could not] obtain what he never possessed.' " *Id.* at 925. The transaction in *Cox,* as in the case at bar, was a sale of assets, not corporate stock, did not involve the purchase of accounts receivable or assumption of the seller's obligations, and resulted in the continuation of the same type of business.

Although there is a dearth of legislative history on the significance of "successor in interest," the statute is to be construed liberally in favor of the veteran. *Coffy v. Republic Steel Corp.,* 447 U.S. 191, 196, 100 S.Ct. 2100, 2105, 65 L.Ed.2d 53 (1980). Moreover, the major purpose of the Act is to ensure that those who fulfill military commitments do not return to civilian life disadvantaged because of their service. The focus of the statutory remedy is on the plaintiff veteran's need for reemployment. For example, when a veteran seeks reemployment, it matters not that the defendant employer has hired another individual or that no vacancy is available. *See e.g., Kay v. General Cable Corp.,* 144 F.2d 653, 655 (3d Cir. 1944).

Congress' primary concern was to ensure that "eligible veterans ... are promptly placed in a satisfactory job or job-training opportunity or receive some specific form of employment assistance." Conf. Rep. No. 1240, 93d Cong., 2d Sess., *reprinted in* [1974] U.S. Code Cong. & Ad. News 6336, 6343.

The court believes that a broad construction of the term "successor in interest" is justified on these facts for several reasons: First, the defendant knew of the plaintiff's claim for reemployment. This situation is entirely different from *Cox* in which the purchasing company bought the business while the plaintiff was still in the military not knowing of the existence or extent of the veteran's potential claim.[11] Second,

---

**10.** A default judgment has been entered against Ollie's Idea, Inc. in this case.

**11.** This question also could be analyzed in terms of vesting of the veteran's reemployment rights. Under the statute, the veteran has no right to reemployment unless he received an honorable discharge, applies for reemployment within ninety (90) days of discharge, and re-

mains qualified for his former position. 38 U.S.C. § 2021 (1976). Therefore, until he returns, his rights do not vest; prior to this time his claim against his former employer is purely speculative. In the instant case, plaintiff Chaltry's right to reemployment had already vested by the time Ollie's was sold because he had met all of the statutory requirements. The reemployment rights of the plaintiff in *Cox,* how-

available to any successor in interest is the hardship defense that his "circumstances have so changed as to make it impossible or unreasonable" to rehire the veteran plaintiff. Neither Ollie's nor Laidlaw put forth such a defense. *See* 38 U.S.C. § 2021(a)(B) (1976). Third, on these facts it appears as though the seller and purchaser of the assets of Ollie's agreed, based on the terms of the sale, to deny the plaintiff the one remedy which Congress found to be most important, reemployment. It is not as though Mr. Freeman continued part of Ollie's business which would be able to employ the plaintiff. As Mr. Freeman testified, he sold all of the assets of Ollie's, paid off the creditors, and moved to Texas.

The court is persuaded by the plaintiff's analogy to the successorship question in the context of civil rights and labor cases. In *EEOC v. MacMillan Bloedel Containers, Inc.*, 503 F.2d 1086, 1098 (6th Cir. 1974), a Title VII case, the court of appeals borrowed by analogy the nine factors relevant in determining whether to hold a successor company liable for the unlawful employment practices of its predecessor. This court is convinced that a majority of these factors militates in favor of successorship liability.[12]

Defendant Laidlaw argues that the public policy behind civil rights and labor legislation is "far more basic, persuasive and crucial" than the policy of veterans' rights. The court cannot accept this generalization. Among the national government's most essential functions is the preservation of our democracy through the maintenance of a strong armed forces. Veterans' legislation not only encourages participation in our national defense but it also attempts to compensate those who gave critical years to their country. The court acknowledges that there are other standards which it

could apply to this case, *see e.g., Wimberly v. Mission Broadcasting Co.*, 523 F.2d 1260 (10th Cir. 1975); *Rix v. Turnbull-Novak, Inc.*, 159 F.Supp. 199 (W.D.Mo.1958); however, under the circumstances of this case the court believes that a broader interpretation of the successorship issue is required.

■ 8. Although Ollie's did offer the plaintiff a temporary position, this position did not approximate his premilitary status. The plaintiff, therefore, did not waive his rights to reemployment under the Act by refusing to accept the temporary position. *Hembree v. Georgia Power Co.*, 637 F.2d 423, 427–28 (5th Cir. 1981).

■ 9. The failure of defendant Ollie's to reemploy the plaintiff when he completed his active duty was in violation of the Act.

10. The circumstances of Ollie's and Laidlaw had not "so changed as to make it impossible or unreasonable" to reinstate the plaintiff according to the Act. 38 U.S.C. § 2021(a)(B) (1976). The plaintiff's evidence indicates that the operation of the radio station proceeded as before. This particular exception to the Act is a narrow one and the defendants introduced no evidence in support of it. *See Davis v. Halifax County School System*, 508 F.Supp. 966, 968 (E.D.N.C.1981).

■ 11. The plaintiff, as a veteran who has been denied reinstatement in violation of the Act, is entitled to back wages and other benefits which he would have received had he been reemployed at WGON–AM and WQXO–FM on or about January 1, 1975, less his actual earnings received from other employers during the same period. *Chernoff v. Pandick Press, Inc.*, 440 F.Supp. 822 (S.D.N.Y.1977); *McCoy v. Olin Mathieson Chemical Corp.*, 360 F.Supp. 1336, 1339 (S.D.Ill.1973).

---

ever, had not vested at the time of the sale of the business because he was still in the service.

**12.** These factors are: (1) whether the successor company had notice of a claim; (2) the ability of the predecessor to provide relief; (3) whether there has been a substantial continuity of business operations; (4) whether the new employer uses the same facilities; (5) whether he

uses the same or substantially the same work force; (6) whether he uses the same or substantially the same supervisory personnel; (7) whether the same jobs exist under substantially the same working conditions; (8) whether he uses the same machinery, equipment, and methods of production; and (9) whether he produces the same product. 503 F.2d at 1094.

12. To the extent that the plaintiff may have failed to mitigate his damages, the burden of proof is on the defendants to establish failure to mitigate. This burden has not been met. *Peel v. Florida Department of Transportation*, 500 F.Supp. 526, 528 (N.D.Fla.1980).

13. Defendants Ollie's and Laidlaw are jointly and severally liable for the violations of the Act.[13]

14. As a result of the defendants' wrongful failure to reemploy the plaintiff, the plaintiff has suffered damages in the amount of $19,318.16, including interest.

15. Judgment shall be entered for the plaintiff, Kenneth Chaltry, against defendants Ollie's Idea, Inc. and Laidlaw and Associates, Inc. in the amount of $19,318.16.

IT IS SO ORDERED.

---

**13.** The plaintiff presented no evidence to support its contention that Ollie's Idea, Inc. was the alter ego of defendant Freeman. Simply

because Mr. Freeman was president and nearly a 100% shareholder of Ollie's does not by itself justify finding personal liability against him.