Brian S. LEIB, Appellant,

v.

GEORGIA–PACIFIC CORPORATION, Appellee.

No. 89–2939.

United States Court of Appeals, Eighth Circuit.

Submitted Sept. 13, 1990.

Decided Feb. 5, 1991.

Robert M. Loeb, Washington, D.C., for appellant.

David A. Rhem, Grand Rapids, Mich., for appellee.

Before JOHN R. GIBSON, Circuit Judge, HEANEY, Senior Circuit Judge, and LARSON,[*] Senior District Judge.

LARSON, Senior District Judge.

Brian Leib appeals from the district court's summary dismissal of his action under the Vietnam Era Veterans' Readjustment Assistance Act of 1974, 38 U.S.C. §§ 2021 *et seq.* The district court granted Georgia–Pacific Corporation's motion for summary judgment, holding as a matter of law that Georgia–Pacific was not a "successor in interest" under the Act and hence was not required to restore Leib to the position he held prior to his enlistment and honorable discharge from the United States Air Force. *See id.* at § 2021(a)(B)(i). We reverse and remand for further proceedings.

I.

In July, 1984, Georgia–Pacific purchased a corrugated container/folding carton manufacturing plant in Dubuque, Iowa from St. Regis. As a result of the sale, Georgia–Pacific assumed ownership of all real property, buildings, timber leases, equipment, furniture, tools, supplies, raw materials, work in process, inventory, customer and supplier lists, patents, trademarks, copyrights, and trade secrets used in connection with the Dubuque plant. Georgia–Pacific also acquired from St. Regis a list of all plant employees and obtained the right to assume St. Regis' collective bargaining agreement with its employees. Upon completion of the sale, Georgia–Pacific hired a majority of the former St. Regis employees, recognized the labor union which had been representing the St. Regis employees, and credited the employees' seniority with St. Regis for vacation and pension vesting purposes. Georgia–Pacific operates the Dubuque plant today by making the same product under the same conditions using the same equipment and facilities as St. Regis formerly did.

Prior to joining the Air Force in December, 1983, Brian Leib was a press helper at the St. Regis plant. Leib was serving in the military when Georgia–Pacific commenced operations in Dubuque. While in the military, Leib received a W–2 form in a Georgia–Pacific envelope. Upon his honorable discharge in December, 1987, Leib sought reemployment with Georgia–Pacific as a returning veteran. Georgia–Pacific refused to recognize Leib's rights as a veteran, claiming it had purchased only the assets of St. Regis, and hence was not obligated as a "successor in interest" under the veterans' reemployment rights statute, 38 U.S.C. §§ 2021–2026.

* The HONORABLE EARL R. LARSON, Senior United States District Judge for the District of Minnesota, sitting by designation.

The government initiated this action on Leib's behalf,[1] arguing that Georgia–Pacific should be regarded as St. Regis' successor in interest for purposes of rehiring returning veterans who were former St. Regis employees. The government maintains that the court should examine the totality of the circumstances, including Georgia–Pacific's operation of the same business at the same location with the same equipment and almost all of the same employees, in determining the successorship question. In granting Georgia–Pacific's summary judgment motion, the district court held that the only relevant factor was whether there was continuity in the identity of ownership and control between Georgia–Pacific and St. Regis. Because there was no common ownership, the court concluded Georgia–Pacific was not a successor in interest under the veterans' reemployment statute. We are presented on appeal with the issue of the proper legal standard for determining when a company is a "successor in interest" under the veterans' reemployment rights statute.

## II.

Statutory reemployment rights for veterans date from the nation's first peacetime draft law, enacted in 1940. Section 8 of the Selective Training and Service Act of 1940 provided that a veteran returning from active duty was entitled to be reinstated to the civilian position the veteran had left or one of like seniority, status, and pay. *See* 38 U.S.C. § 2021(a).[2] The 1940 legislation was an effort by Congress "to offer [veterans] as much protection with respect to reemployment and retention of employment benefits as is within reasonable bounds." 86 Cong.Rec. 10095 (1940) (remarks of Sen. Sheppard) (cited in *Carter v. United States*, 407 F.2d 1238, 1243 (D.C.Cir.1968)).

Finding a civilian job upon completion of military service had been difficult for many returning World War I veterans, whose former jobs had been filled by others drawn into the labor force by wartime production needs. *Carter*, 407 F.2d at 1243.[3] The statutory right to reinstatement was intended both to bolster the morale of those serving their country and to facilitate their reentry into the "highly competitive world of job finding without the handicap of a long absence from work." *Id.* (citing *Kay v. General Cable Corp.*, 59 F.Supp. 358, 360 (D.N.J.1945)).

> That worry over losing a job might have substantial adverse impact on the morale of the armed services is plain. Indeed, the morale problem was viewed as the source of Congressional power to enact reemployment laws writing new terms into private labor contracts beyond the normal reach of Congress.

*Carter*, 407 F.2d at 1243 (footnote omitted). *See Peel v. Florida Dep't of Transportation*, 600 F.2d 1070, 1084 (5th Cir.1979).[4]

---

**1.** Section 2022 of title 38 provides that "[u]pon application to the United States attorney or comparable official ... by any person claiming to be entitled to [veterans' reemployment benefits], such United States attorney or official, if reasonably satisfied that the person so applying is entitled to such benefits, shall appear and act as attorney for such person in the amicable adjustment of the claim or in the filing of any motion, petition, or other appropriate pleading and the prosecution thereof." 38 U.S.C. § 2022.

**2.** The Selective Training and Service Act of 1940, 54 Stat. 890, was reenacted in the Military Selective Service Act of 1967 as 50 U.S.C.App. § 459, which was subsequently reenacted in the Vietnam Era Veterans' Readjustment Assistance Act of 1974 as 38 U.S.C. §§ 2021 *et seq. See Coffy v. Republic Steel Corp.*, 447 U.S. 191, 194 n. 2 & 196 n. 5, 100 S.Ct. 2100, 2104 n. 2 & 21 n. 5, 65 L.Ed.2d 53 (1980); *Carter v. United States*, 407 F.2d 1238, 1243 (D.C.Cir.1968).

**3.** Over 200,000 World War I veterans ended up jobless and enrolled in Civilian Conservation Corps camps upon their return from service to their country. *Carter*, 407 F.2d at 1243. In hearings on the 1940 legislation, Representative Clason noted that during WWI "while employers indicated that when their men went into the service they would receive their jobs back, the men did not get them back after they returned." Hearings before the House Committee on Military Affairs on H.R. 10132, 76th Cong., 3d Sess. 86 (1940) (cited in Special Monograph No. 2, *The Selective Service Act: Its Legislative History, Amendments, Appropriations, Cognates and Prior Instruments of Security* 569 (1954) (hereinafter *The Selective Service Act*)).

**4.** Congress enacted the Selective Training and Service Act of 1940 and subsequent amendments thereto pursuant to the congressional war power contained in article I, section 8 of the

Congress continued the peacetime draft after World War II in response to the "consistent dissipation in the strength of our armed forces ... as new enlistments have failed to keep pace with the separation from the services of those who were leaving upon the completion of wartime obligations to serve." S.Rep. No. 1268, 80th Cong., 2nd Sess. (1948), *reprinted in* 1948 U.S.Code Cong.Serv.1989. The Selective Service Act of 1948 expanded the reemployment portion of the law to include not only the returning veteran's former employer, but also any "successor in interest." *Rix v. Turnbull–Novak, Inc.,* 245 F.2d 809, 811 (8th Cir.1957). Subsequent legislation has further expanded the reach of the statute by adding state and local government employers and by extending reemployment rights to reservists, employees returning from training duty, and those in the National Guard. *See Monroe v. Standard Oil Co.,* 452 U.S. 549, 555, 101 S.Ct. 2510, 2514, 69 L.Ed.2d 226 (1981); *Peel,* 600 F.2d at 1073.

The statute Brian Leib invokes today thus provides as follows:

> In the case of any person who is inducted into the Armed Forces of the United States ... for training and service and who leaves a position ... in the employ of any employer in order to perform such training and service, and (1) receives a certificate ... (relating to the satisfactory completion of military service), and (2) makes application for reemployment within ninety days after such person is relieved from such training and service
>
> ...
>
> ....

(B) if such position was in the employ of ... a private employer, such person shall—

> (i) if still qualified to perform the duties of such position, be restored by such employer or the employer's successor in interest to such position or to a position of like seniority, status, and pay;
>
> ....

> unless the employer's circumstances have so changed as to make it impossible or unreasonable to do so.

38 U.S.C. § 2021(a).

Although the term "successor in interest" has been part of the statute since 1948, Congress has provided no definition of the phrase. This Court first considered its meaning in *Rix v. Turnbull–Novak, Inc.,* 245 F.2d 809 (8th Cir.1957). Prior to serving in the military, plaintiff Rix was an inspector with the architectural firm J. Gordon Turnbull, Inc. at a salary of $500 per month. Upon Rix's honorable discharge, he was rehired by Turnbull as an assistant manager at a salary of $700 per month. Shortly after Rix had been rehired, the vice president in charge of the Kansas City office, Ed Novak, entered into an agreement to purchase the assets of J. Gordon Turnbull, Inc.'s Kansas City office. Novak transferred those assets, which included fixtures, all pending contracts, and the assumption of Turnbull, Inc.'s lease, to a corporation created to carry on the business, Turnbull–Novak, Inc. When Novak refused to continue to employ Rix as an assistant manager, Rix sued, claiming entitlement to this position under the veterans' reemployment rights statute.

There was no common ownership between J. Gordon Turnbull, Inc. and Turn-

Constitution. Section 8 provides in relevant part as follows:
> The Congress shall have Power To ... provide for the common Defence and general Welfare of the United States
>
> .    .    .    .    .
>
> ....
>
> To declare War, ...
> To raise and support Armies, ...
> To provide and maintain a Navy;
> To make Rules for the Government and Regulation of the land and naval Forces;

> ....
>
> To provide for organizing, arming, and disciplining, the Militia, and for governing such Part of them as may be employed in the Service of the United States, ...
>
> ....
>
> To make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers.

U.S. Const., art. 1, sec. 8.

bull–Novak, Inc., however, and the district court initially granted summary judgment to Turnbull–Novak on the ground that it was not a "successor in interest" under the veterans' reemployment law. This Court reversed, stating that the issue of whether the defendant was a successor in interest "must be defined and decided upon a trial with findings of fact and conclusions of law." *Rix*, 245 F.2d at 812. While limiting the effect of its holding,[5] the Court recognized the government's argument that "[o]n its face the phrase 'successor in interest' would seem to include any form of transfer of the employer's business" and that:

> "so long as the former employer's business is still in operation and the defendant now holds the interest, the veteran has reemployment rights against the present owner regardless of how he or it succeeded to the former owner's interest in the business."

*Id.* at 811.

On remand, the district court entered judgment in favor of the defendant, and the case was again appealed to this Court. The Court assumed on appeal that Turnbull–Novak was a successor in interest, and affirmed the judgment in its favor on the ground that plaintiff never sought reemployment to the same position he had left, but rather sought to perform work "of a distinctly different nature at a very substantial increase in pay," a position which was not protected by the veterans' reemployment statute. *Rix*, 260 F.2d 785, 788–89 (8th Cir.1958).

In this case, we are squarely presented with the question of the proper test for successor liability under the veterans' reemployment law. Since our decision in *Rix*, some courts have limited successors in interest to companies which have continuity of ownership or control with the veteran's former employer. *See, e.g., Cox v. Feeders Supply Co.*, 344 F.2d 924 (6th Cir.1965) (per curiam). Others have considered a variety of factors, such as are used to determine successor liability in the context of civil rights and labor law cases, to determine successorship under the veterans' reemployment statute. *See, e.g., Chaltry v. Ollie's Idea, Inc.*, 546 F.Supp. 44, 51 (W.D.Mich.1982).

In determining which test best effectuates Congress' intent under the veterans' rights law, we are mindful of the Supreme Court's observation that "[t]here is, and can be, no single definition of 'successor' which is applicable in every legal context. A new employer, in other words, may be a successor for some purposes and not for others." *Howard Johnson Co. v. Detroit Local Joint Executive Board, Hotel & Restaurant Employees*, 417 U.S. 249, 263 n. 8, 94 S.Ct. 2236, 2243 n. 8, 41 L.Ed.2d 46 (1974).

Our approach in *Rix* was consistent with the Court's admonition in *Howard Johnson* that:

> [p]articularly in light of the difficulty of the successorship question, the myriad factual circumstances and legal contexts in which it can arise, and the absence of congressional guidance as to its resolution, emphasis on the facts of each case as it arises is especially appropriate.

*Id.* at 256, 94 S.Ct. at 2240. Emphasizing that the issue of successor liability should not be determined in a vacuum, the *Howard Johnson* Court advocated an analysis of the interests of each of the parties and the policies of the law sought to be enforced in light of the facts of each case and the particular legal obligation at issue. *Id.* at 262–63 n. 8, 94 S.Ct. at 2243–44 n. 8. *See generally Safer v. Perper*, 569 F.2d 87, 95 (D.C.Cir.1977).

The particular legal obligation at issue here is Georgia–Pacific's obligation to rehire a returning veteran to the veteran's former position or one of like seniority, status, and pay. The interest of Leib, as a returning veteran, is to obtain the reemployment benefits guaranteed by statute to qualified, honorably discharged service men and women. Leib's interest as a re-

---

**5.** The Court stated, "[w]e make no decision upon any of the facts other than to declare that the court erred in granting the motion for summary judgment." *Rix v. Turnbull–Novak, Inc.*, 245 F.2d 809, 812 (8th Cir.1957).

turning veteran coincides with the policy of the veterans' reemployment law, which is to ensure that veterans returning to civilian employment are not penalized by their service for their country, but rather, gain by their service "an advantage which the law withheld from those who stayed behind." *Fishgold v. Sullivan Drydock & Repair Corp.*, 328 U.S. 275, 284, 66 S.Ct. 1105, 1111, 90 L.Ed. 1230 (1946). The veterans' reemployment rights statute, as amended,

> clearly manifests a purpose and desire on the part of Congress to provide as nearly as possible that persons called to serve their country in the armed forces should, upon returning to work in civilian life, resume their old employment without any loss because of their service to their country.

*Accardi v. Pennsylvania R.R.*, 383 U.S. 225, 228, 86 S.Ct. 768, 770, 15 L.Ed.2d 717 (1966). *See also Dyer v. Hinky Dinky, Inc.*, 710 F.2d 1348, 1350 (8th Cir.1983); *Boyle v. Board of Police Commissioners*, 717 F.Supp. 23, 25–26 (D.N.H.1989).

To accomplish this purpose, courts have universally held that the veterans' reemployment statute is "to be liberally construed for the benefit of those who left private life to serve their country." *Fishgold*, 328 U.S. at 285, 66 S.Ct. at 1111. *See Shadle v. Superwood Corp.*, 858 F.2d 437, 439 (8th Cir.1988); *Dyer*, 710 F.2d at 1350; *Goggin v. Lincoln St. Louis*, 702 F.2d 698, 704 (8th Cir.1983). And, as the Supreme Court has expressly stated, "no practice of employers or agreements between employers and unions can cut down the service adjustment benefits which Congress has secured the veteran under the Act." *Fishgold*, 328 U.S. at 285, 66 S.Ct. at 1111.

A test for successor liability which looks to the practical realities of business continuity is most consistent with the policies underlying the veterans' reemployment statute, particularly in today's economy, where mergers, acquisitions, and takeovers are common.[6] Leib argues that an ap-

proach which focuses exclusively on continuity of ownership or control substantially diminishes a veteran's rights and allows "a simple paper transaction" to rob returning veterans of the reemployment benefits Congress sought to guarantee.

Perhaps for these reasons, the Department of Labor views a multi-factor, business continuity approach as the most consistent with Congress' intent under the veterans' reemployment statute. *See* U.S. Department of Labor, *Veterans' Reemployment Rights Handbook*, 9–2 to 9–3 (1986); U.S. Department of Labor, *Legal Guide and Case Digest* 515 (1973). The Department's *Reemployment Rights Handbook* and *Legal Guide* provide "informed guidance" regarding the proper interpretation of the veterans' reemployment statute. *Shadle*, 858 F.2d at 439–40; *Dyer*, 710 F.2d at 1352. *See Monroe*, 452 U.S. at 563 n. 14, 101 S.Ct. at 2518 n. 14.

Borrowing from civil rights and labor laws, the *Reemployment Rights Handbook* lists nine factors which may be relevant in determining whether there is sufficient business continuity to require a successor to rehire a returning veteran. *See* U.S. Department of Labor, *Veterans' Reemployment Rights Handbook*, 9–2 to 9–3 (1986). This Court has made similar analogies in other contexts, recognizing that the purposes and protections offered to veterans under the reemployment statute are similar to those offered employees under Title VII and the National Labor Relations Act. *Dyer*, 710 F.2d at 1351.

Georgia–Pacific concedes that an approach for determining successor liability similar to that applied under the National Labor Relations Act could properly be applied to determine successorship under the veterans' reemployment law. Georgia–Pacific argues, however, that an approach which examines business continuity by taking into account the totality of the circumstances can only be applied when a veteran's rights have "vested." According to

---

**6.** In 1987, for example, the Census Bureau reported 2,032 mergers and acquisitions in the United States, forty-one percent of which were cash purchases of assets. Bureau of the Census, United States Department of Commerce, Statistical Abstracts of the United States 430 (109th ed. 1989).

Georgia–Pacific, this "vesting" takes place only after a veteran is honorably discharged and has been denied reemployment by the veteran's former employer prior to a purchase of the former employer's assets.

We agree with Leib that there is no basis for such an interpretation of the phrase "successor in interest" in the veterans' reemployment statute. The law requires successor employers to rehire returning veterans to facilitate Congress' provision for this country's defense, not to address wrongdoing on the part of the predecessor employer. As Senator Thomas explained with regard to the original reemployment provisions in the 1940 Selective Training and Service Act:

> [I]f Congress has the power to raise an army that power can be effectively exercised only if the Congress can take such measures as are necessary to make it an efficient army and to prevent undue hardships upon the persons who constitute the army ... no one can deny that if we guarantee [veterans] their jobs when their military service is completed we have taken a long step in providing the Army and Navy with patriotic men who are willing and anxious to serve their country ... it is not unreasonable to require the employers of such men to rehire them upon completion of their service, since the lives and property of the employers, as well as the lives and property of everyone else in the United States are defended by such service.

96 Cong.Rec. 10573 (1940) (remarks of Sen. Thomas).[7]

A definition of "successor in interest" under the veterans' reemployment law consistent with the definition applied under the labor law is supported by an early version of the 1940 Selective Training and Service Act, which provided that an employer's failure to rehire a qualified returning veteran could constitute an unfair labor practice if the employer was engaged in interstate commerce. *See* 86 Cong.Rec. 10572 (1940) (remarks of Sen. Thomas).[8] The legislation eventually adopted by Congress provided a direct right of action in federal court for all reemployment claims,[9] but the early version of the law suggests the analogy to successor liability under the National Labor Relations Act is an appropriate one.

As a new owner of the Dubuque plant, Georgia–Pacific undeniably has an interest in conducting its business independently. *See Golden State Bottling Co. v. NLRB*, 414 U.S. 168, 182, 94 S.Ct. 414, 424, 38 L.Ed.2d 388 (1973) (citing *John Wiley & Sons, Inc. v. Livingston*, 376 U.S. 543, 549, 84 S.Ct. 909, 914, 11 L.Ed.2d 898 (1964)). Georgia–Pacific concedes, however, that its operations have such continuity with those of St. Regis that it is recognized as a successor employer under the labor laws and has bargained with the union which formerly represented employees in negotiations with St. Regis. Under these circumstances, treating Georgia–Pacific as a successor for veterans' reemployment purposes further affects Georgia–Pacific's ability to structure its own employer-employee relationships, but the obligation is a limited one which extends only to qualified former employees,[10] whose number and

---

**7.** In this respect, a successor employer's obligation to rehire qualified returning veterans may be more akin to a successor's obligation to bargain with an existing union than to a successor's obligation to remedy an act of unlawful discrimination previously committed by its predecessor.

**8.** In concluding his analysis of the reemployment provisions of the 1940 Act, Senator Thomas stated: "If the Congress can require an employer to reinstate employees [under the National Labor Relations Act] so that interstate commerce will not be burdened, it can require an employer to reinstate employees whenever such requirement is reasonably necessary in the in-

terest of the common defense." 96 Cong.Rec. 10574 (1940).

**9.** The House bill originally provided for immediate referral to federal district court; the Senate bill was amended on the floor of the Senate to provide for such immediate referral. *See generally The Selective Service Act*, at 576.

**10.** The statute obligates employers to rehire only those veterans who reapply for their former positions within 90 days of their honorable discharge. 38 U.S.C. § 2021(a)(2). Upon rehire, veterans are protected by the statute from discharge except for cause, but that protection extends for only one year. *Id.* § 2021(b)(1).

former positions are most likely ascertainable at the time of the purchase.[11]

Moreover, as this Court has recognized, a case by case approach to successor liability can be applied in a way which takes into account the rights of employers and facilitates the transfer of capital, while protecting the rights of employees. *Smegal v. Gateway Foods of Minneapolis, Inc.*, 819 F.2d 191, 193 (8th Cir.), *cert. denied*, 484 U.S. 928, 108 S.Ct. 293, 98 L.Ed.2d 253 (1987). The test for successor liability cited in *Smegal* includes consideration of whether there is (1) substantial continuity of the same business operations, (2) use of the same plant, (3) continuity of work force, (4) similarity of jobs and working conditions, (5) similarity of supervisory personnel, (6) similarity in machinery, equipment, and production methods, and (7) similarity of products or services. *Id.* at 194. These same factors, with the addition of whether the successor had notice of the employee's claim and the ability of the predecessor to provide relief, have been applied in Title VII cases brought by employees to remedy charges of discrimination. *See EEOC v. McMillian Bloedel Containers, Inc.*, 503 F.2d 1086, 1094 (6th Cir.1974).

### III.

A definition of "successor in interest" under 38 U.S.C. § 2021, which includes consideration of circumstances such as those listed above, properly balances the rights of employers and returning veterans and best effectuates Congress' intent under the veterans' reemployment statute. *See, e.g., Chaltry*, 546 F.Supp. at 51. Accordingly, we hold that the district court erred in focusing exclusively on whether there was continuity of ownership or control in determining whether Georgia–Pacific was a successor in interest under the veterans' reemployment rights statute. On remand, the district court should consider all relevant factors, including whether there is substantial continuity between the operations of St. Regis and Georgia–Pacific at the Dubuque plant and whether St. Regis' circumstances have so changed as a result of the sale that it would be "impossible or unreasonable" for St. Regis to reemploy Leib, to determine whether Georgia–Pacific should be deemed a successor for purposes of rehiring plaintiff Leib upon completion of his service to our country.

The judgment of the district court is reversed and the case remanded for further proceedings.

---

**11.** Because the district court granted summary judgment based on a theory that successors in interest were limited to companies with continuity of ownership or control, the parties did not complete discovery nor present to the court all facts which might be relevant under a multifactor business continuity approach to successor liability.