117 F.3d 1454
 155 L.R.R.M. (BNA) 2748, 326 U.S.App.D.C. 104,
134 Lab.Cas. P 10,066
 LEE LUMBER AND BUILDING MATERIAL CORP., Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent,
Chicago and Northeast Illinois District Council of
Carpenters, Carpenter Local No. 1027, Mill-Cabinet
Industrial Division and Chicago and
Northeast Illinois District
Council of
Carpenters,
Intervenor.
 No. 96-1362.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued May 14, 1997.
Decided July 8, 1997.
 
 On Petition for Review and Cross-Application for Enforcement of an Order of the National Labor Relations Board.
 James S. Frank, New York City, argued the cause for petitioner, with whom Steven M. Post was on the briefs.
 Deborah E. Shrager, Attorney, National Labor Relations Board, Washington, DC, argued the cause for respondent, with whom Linda Dreeben, Deputy Assistant General Counsel, Linda R. Sher, Associate General Counsel, and Aileen A. Armstrong, Deputy Associate General Counsel, were on the brief. Peter D. Winkler, Supervisory Attorney, and David S. Habenstreit, Attorney, entered appearances.
 Collins P. Whitfield, Chicago, IL, argued the cause and filed the brief for intervenor.
 Jonathan P. Hiatt, Boston, MA, James B. Coppess, David M. Silberman and Laurence S. Gold, Washington, DC, filed the brief for amicus curiae American Federation of Labor and Congress of Industrial Organizations.
 Before: SILBERMAN, GINSBURG and SENTELLE, Circuit Judges.
 Opinion for the Court filed PER CURIAM.
 
 
 1
 Concurring opinion filed by Circuit Judge SILBERMAN.
 
 
 2
 Opinion filed by Circuit Judge SENTELLE concurring in part and concurring in the judgment.
 
 PER CURIAM:
 
 3
 Lee Lumber and Building Material Corporation ("Lee" or "Company") petitions from a decision of the National Labor Relations Board ("NLRB" or "Board") holding that it had engaged in various unlawful practices and ordering it to bargain with Carpenter Local No. 1207 ("Union"). Agreeing with two of Lee's principal contentions, we remand the case to the Board for further proceedings.
 
 BACKGROUND
 The Poll and the Filing of the Petition
 
 4
 Petitioner runs a mill shop in Chicago. In October 1988 the NLRB certified the Union as the exclusive bargaining representative of the previously unrepresented mill shop employees. The unit contained approximately 14 employees. The Company and the Union entered into a collective bargaining agreement that expired in May 1990.
 
 
 5
 In February 1990 the Union informed the Company that it wished to begin negotiating for a renewal contract. The parties informally agreed to a schedule for negotiations. Around this time a number of employees became concerned that the Union would push to substitute the Union's pension plan for the Company's profit-sharing plan. In the wake of this concern, the employees conducted a straw poll to see if a majority still wished to be represented by the Union. The poll indicated that a majority still did.
 
 
 6
 Sometime after the poll, a number of employees asked Randy Baumgarten, a part owner and Secretary-Treasurer of Lee Lumber, about the profit-sharing plan. Baumgarten held a meeting at which he answered questions about the profit-sharing plan and the Union pension plan. Baumgarten reminded the employees that in negotiations the Union had sought to replace the profit-sharing program with a Union pension plan, and said that the Union might do so again in the upcoming negotiations.
 
 
 7
 Shortly after this meeting, two employees prepared and began circulating a petition seeking another certification election. Twelve of the fourteen employees signed the petition. The Company allowed these employees to take paid time off from work to take the petition to the Board's regional office. The general rule at the Company was that employees did not get paid for time spent away from work on personal business.
 
 The Initial Refusal to Negotiate
 
 8
 On March 26, one week after the employees' petition was filed with the Board, the Union sent the Company a letter requesting that the parties meet on April 11 to begin negotiations for the new collective bargaining agreement. On March 29 the Union filed a charge seeking to "block" a decertification election, alleging that Lee Lumber had sponsored or assisted in the filing of the March 20 petition.
 
 
 9
 On April 11, when Union negotiators appeared at the Company, Baumgarten handed them the following statement:
 
 
 10
 Due to the petition signed by a majority of the employees in the bargaining unit it is appropriate to defer the onset of negotiations until your local is shown to still represent the men after the election. We therefore decline your invitation to bargain at this time.
 
 
 11
 On May 3 the Union filed a second charge with the Board alleging that Lee had refused to bargain with the Union.
 
 
 12
 On April 30 the Union wrote a letter to Baumgarten suggesting that they negotiate. Baumgarten did not respond until May 8, when he wrote back agreeing to meet with the Union. They did so on May 23 and four subsequent dates through June. By the end of these sessions the parties had almost reached agreement on a new contract.
 
 
 13
 In early July an employee handed Baumgarten a document signed by a majority of the employees. The document declared that the employees would not continue to be represented by any union, and that the group "hereby decertified [the Union]." Upon receiving this document the Company broke off all contact with the Union.
 
 The Alleged Refusal to Provide Information
 
 14
 The Union's March 26 letter requested copies of "the current insurance policy." When the parties met on May 23, the Union repeated this request, and also asked for information regarding various aspects of the Company's profit sharing plan. At the May 23 meeting the Company gave the Union a 71-page booklet about the health insurance plan, but did not produce the policy itself. The profit-sharing plan was discussed extensively at the May 23 meeting, and the Company never asked for that information again. The Company never, however, presented the Union with the precise information it requested.
 
 Procedural Background
 
 15
 An ALJ ruled that Lee violated § 8(a)(1) of the National Labor Relations Act ("Act") by providing assistance to the employees who took the decertification petition to the Board. The ALJ further found that the Company's initial refusal to meet with the Union, failure to provide the Union with the information it requested, and subsequent withdrawal of recognition of the Union violated § 8(a)(1) and § 8(a)(5).
 
 
 16
 The Board adopted these findings in February 1992. As a remedy, the Board adopted the ALJ's order that the Company, inter alia, recognize and bargain with the Union. The Company filed a petition for review in this court. The Board moved to dismiss the petition without prejudice so that it could reconsider its position in light of our intervening decisions in Sullivan Indus. v. NLRB, 957 F.2d 890 (D.C.Cir.1992), and Williams Enters., Inc. v. NLRB, 956 F.2d 1226 (D.C.Cir.1992). We granted the Board's motion.
 
 
 17
 In 1995 the Board heard argument on the question, and in 1996, four years after its decision to reconsider the matter, the Board issued its Supplemental Decision and Order ("Supplemental Decision"). In the Supplemental Decision the Board reaffirmed the findings and rulings of the previous order. In doing so the Board announced that in cases involving a § 8(a)(5) refusal to recognize and bargain with an incumbent union and a subsequent loss of majority support for the union, the Board would apply a "rebuttable presumption" of a causal relationship between the two. The presumption can be "rebutted only by an employer's showing that employee disaffection arose after the employer resumed its recognition of the union and bargained for a reasonable period of time without committing any additional unfair labor practices that would detrimentally affect the bargaining." Supplemental Decision at 4. The Board determined that in this case a reasonable time had not passed. Lee's July withdrawal of recognition from the Union was therefore unlawful. The Board also reaffirmed its finding that an affirmative bargaining order was the appropriate remedy.
 
 
 18
 The Company raises numerous challenges in a petition for review. The Board has filed a cross-petition for enforcement of its Order. The Union, as intervenor, and the AFL-CIO, as amicus, have each filed a brief in support of the Board.
 
 ANALYSIS
 
 19
 Three of the Company's challenges merit extended discussion. We reject all of the remaining challenges that we do not discuss.
 
 1. The Presumption of a Taint
 
 20
 A union enjoys an irrebuttable presumption of majority support while a collective bargaining agreement is in effect. Auciello Iron Works, Inc. v. NLRB, 517 U.S. 781, ----, 116 S.Ct. 1754, 1758, 135 L.Ed.2d 64 (1996); Belcon, Inc., 257 N.L.R.B. 1341, 1346-47 (1981). After the contract expires, the presumption becomes rebuttable. Auciello, 517 U.S. at ----, 116 S.Ct. at 1758; Guerdon Indus., Inc., 218 N.L.R.B. 658, 659 (1975). An employer at that point may rebut the presumption and withdraw recognition from the union if it can show either "(1) the union did not in fact enjoy majority support, or (2) the employer had a good-faith doubt, founded on a sufficient objective basis, of the union's majority support." Auciello, 517 U.S. at ----, 116 S.Ct. at 1758 (internal quotations omitted).
 
 
 21
 This rule, however, assumes that the employer did not commit any unfair labor practice. When the employer has committed an unfair labor practice the Board considers whether the unfair labor practice "tended to (1) have a detrimental or lasting effect upon employees; (2) cause employee dissatisfaction with the union; or (3) disrupt employee morale, deter their organization activities, and discourage their membership in the union." Williams Enters., Inc. v. NLRB, 956 F.2d 1226, 1236 (D.C.Cir.1992).
 
 
 22
 In Sullivan Indus. v. NLRB, 957 F.2d 890, 899 (D.C.Cir.1992), we questioned whether the NLRB had a per se rule that an unlawful refusal to bargain taints the employer's subsequent repudiation of the union; after reviewing the Board's prior decisions, we concluded that the Board had not in fact adopted such a rule, "let alone justified and explained" it. 957 F.2d at 902. Now the Board explicitly has adopted not a per se rule but a rebuttable presumption that there is a causal nexus between an employer's unlawful refusal to bargain and its subsequent repudiation of the union. In the decision under review, the Board first reaffirmed the general rule that in a case involving an unfair labor practice other than a refusal to bargain the union must show specific proof of a causal relationship between the unfair labor practice and the subsequent repudiation of the union; in cases involving an unlawful refusal to recognize and bargain, however, the Board held that "the causal relationship between unlawful act and subsequent loss of majority support may be presumed," Supplemental Decision at 3, regardless of whether the employees were aware of the employer's unlawful behavior. Therefore the Board would not hear evidence about what the employees knew or about "the actual impact of such refusals to bargain on the employees' morale, organizational activities, and union membership." Id. at 3 n. 23. The presumption can be rebutted "only by an employer's showing that employee disaffection arose after the employer resumed its recognition of the union and bargained for a reasonable period of time without committing any additional unfair labor practices that would detrimentally affect the bargaining." Id. at 4.
 
 
 23
 Lee contends that the Board's new presumption is irrational because it contradicts the Board's own long-standing general rule that there must be evidence demonstrating a "causal nexus" between an unremedied unfair labor practice and the Union's loss of majority support. The Company also argues that the presumption is inconsistent with the Act because it undermines the employees' statutory rights "to bargain collectively through the representatives of their own choosing," 29 U.S.C. § 157, or to refrain from doing so.
 
 
 24
 The Board has "primary responsibility for developing and applying national labor policy." NLRB v. Curtin Matheson Scientific, Inc., 494 U.S. 775, 786, 110 S.Ct. 1542, 1548, 108 L.Ed.2d 801 (1990). Accordingly, we give "considerable deference" to a presumption adopted by the Board as long as that presumption is rational and consistent with the Act, regardless whether the Board's rule departs from its prior policy and whether we think a different rule would be preferable. Id. at 786-88, 110 S.Ct. at 1549-50; see also Auciello, 517 U.S. at ----, 116 S.Ct. at 1759 (quoting Curtin Matheson). A presumption is rational "if there is a sound and rational connection between the proved and inferred facts." Chemical Mfrs. Ass'n v. DOT, 105 F.3d 702, 705 (D.C.Cir.1997) (citing NLRB v. Baptist Hosp., Inc., 442 U.S. 773, 787, 99 S.Ct. 2598, 2606, 61 L.Ed.2d 251 (1979)).
 
 
 25
 We are persuaded that the presumption the Board has adopted in this case is both rational and consistent with the Act. First, the Board has provided a rational justification for the presumption. The Board has in the past been particularly concerned with the potentially harmful effects of a refusal to bargain with or recognize a Union, see, e.g., Karp Metal Prods. Co., Inc., 51 N.L.R.B. 621, 624 (1943). In Sullivan we agreed that a refusal to recognize or bargain is "a particularly egregious kind of § 8(a)(5) violation." 957 F.2d at 900. As the Board explained in this case, it is rational to presume a link between a prior unlawful refusal to bargain and a subsequent employee repudiation of the union because
 
 
 26
 [l]engthy delays in bargaining deprive the union of the ability to demonstrate to employees the tangible benefits to be derived from union representation. Such delays consequently tend to undermine employees' confidence in the union by suggesting that any such benefits will be a long time coming, if indeed they ever arrive. Thus, delays in bargaining caused by an employer's unlawful refusal to recognize and bargain with an incumbent union foreseeably result in loss of employee support for the union, whether or not the employees know about the delay.
 
 
 27
 Supplemental Decision at 3. It was also rational for the Board to conclude that requiring an employer to bargain with the union for a reasonable time in order to cure the taint of its unlawful refusal to bargain "removes from the employer the temptation to avoid its bargaining duties in the hopes that delay will undermine employee support for the union." Id. at 5. Furthermore, the presumption is not irrational, as the petitioners contend, simply because it creates an exception to the Board's general rule that there must be evidence of a causal nexus. See Curtin Matheson, 494 U.S. at 787, 110 S.Ct. at 1549. Nor did the Board here make an explicit policy decision to presume something counterfactual. Compare id. at 816-17, 110 S.Ct. at 1564-65 (Scalia, J., dissenting).
 
 
 28
 The presumption is also consistent with the Act. The Company contends that the presumption undermines employees' statutory right to choose whether they want union representation because it forces the employer to bargain with the union for a reasonable time even when that union no longer enjoys majority support. It is important to keep in mind, however, that the presumption comes into play only when the employer's failure to recognize and bargain with a duly elected union precedes the union's loss of majority support. Thus, the Board's presumption actually supports employee free choice because it prevents an employer from "pointing to an intervening loss of employee support for the union when such loss of support is a foreseeable consequence of the employee's unfair labor practice." Fall River Dyeing & Finishing Corp. v. NLRB, 482 U.S. 27, 51 n. 18, 107 S.Ct. 2225, 2240 n. 18, 96 L.Ed.2d 22 (1987). And the Board permits--or at least purports to permit (see infra pp. 8-10)--an employer to rebut the presumption by bargaining for a reasonable time and thereby countering the ill effects of the employer's failure to do so.
 
 
 29
 2. The Application of the Presumption to this Case
 
 
 30
 In addition to its facial challenge to the Board's presumption, petitioner also challenges the Board's application of that presumption to the facts of this case. The Board's presumption "can be rebutted only by an employer's showing that employee disaffection arose after the employer resumed its recognition of the union and bargained for a reasonable period of time." Supplemental Decision at 4. In this case the Board determined that Lee had not resumed bargaining for a reasonable period of time before it withdrew recognition from the Union in July. Petitioner contends that this determination was arbitrary.
 
 
 31
 We agree. While it is clear that the Board is to be given a great deal of deference in developing the rules that it will apply to particular situations, it is equally clear that the Board, like every other administrative agency, must provide a logical explanation for what it has done. Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983). In this case the Board failed to satisfy this basic obligation.
 
 
 32
 The Board outlined the factors it would use in determining whether parties had bargained for a reasonable period of time. It explained that the determination did "not depend on either the passage of time or on the number of meetings between the parties, but instead on what transpired and what was accomplished during the meetings. The Board considers the degree of progress made in negotiations, whether or not the parties were at impasse, and whether the parties were negotiating for an initial contract." Supplemental Decision at 5.
 
 
 33
 Immediately after listing what it would and would not consider in making "reasonable period of time" determinations, the Board proceeded to make that determination in this case. The logical thing for the Board to have done at this point would be to apply the factors that it had just said were dispositive. The Board, however, did not do this. Rather than look to "the degree of progress made in negotiation, whether or not the parties were at impasse, and whether the parties were negotiating for an initial contract," the Board all but ignored these factors and looked primarily at the number of negotiating sessions the parties had held and the length of time that had passed between when the Company agreed to meet with the Union and when it broke off negotiations. These, however, were the very factors that the Board had just explained it would not use in making this determination. Moreover, the Board acknowledged that the Company and Union had virtually reached complete agreement when the employees submitted their letter to decertify the Union, but the Board ignored that progress in its calculus of reasonable time. Instead, it overruled without explanation its prior cases, see Tajon, Inc., 269 N.L.R.B. 327 (1984); Brennan's Cadillac, 231 N.L.R.B. 225 (1977), which had held that progress in reaching agreement and absence of impasse are factors indicating that a reasonable time for bargaining has elapsed. But overruling those cases is inconsistent with the Board's emphasis on what is accomplished at the meeting.
 
 
 34
 There is a clear and fundamental inconsistency between the standard the Board announced for determining whether a "reasonable period of time" has elapsed and the Board's application of that standard in this case. The Board's failure to explain this inconsistency is arbitrary. See State Farm, 463 U.S. at 43, 103 S.Ct. at 2866. We remand the question to the Board for correction of this flaw. On remand the Board may also wish to provide a fuller explanation of its "reasonable period of time" standard. As it stands now, it is not entirely clear how any of the three factors cut.
 
 3. The Imposition of a Bargaining Order
 
 35
 As a remedy, the Board issued an affirmative bargaining order. An affirmative bargaining order requires the company to bargain with the union. It also imposes a "decertification bar" on employees. The union that is the subject of the bargaining order will continue as the employees' representative, regardless of the employees' wishes, until a "reasonable time" has passed. Williams, 956 F.2d at 1237. The Board imposed the affirmative bargaining order with no discussion of the facts of this case. It merely cited to two recent Board opinions in which the Board announced that an affirmative bargaining order is always appropriate in cases involving unlawful refusals to recognize and bargain with an incumbent union. Caterair Int'l, 322 N.L.R.B. No. 11 (1996); Williams Enters., Inc., 312 N.L.R.B. 937, 940-42 (1993). Lee contends that the Board's use of an affirmative bargaining order in this case was unlawful. The Board notes that its power to craft remedies is "a broad discretionary one, subject to limited judicial review." Fibreboard Paper Prods. Corp. v. NLRB, 379 U.S. 203, 216, 85 S.Ct. 398, 405, 13 L.Ed.2d 233 (1964). It argues that we should uphold its decision to impose an affirmative bargaining order in this case.
 
 
 36
 Because affirmative bargaining orders interfere with the employee "free choice" that is a "core principle" of the Act, we have long viewed them with suspicion. Skyline Distribs. v. NLRB, 99 F.3d 403, 411 (D.C.Cir.1996). In NLRB v. Gissel Packing Co., 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969), the Court considered the question whether a bargaining order was an appropriate remedy to counter employer unfair labor practices directed at a non-incumbent union. The Gissel Court determined that there were two categories of cases in which a bargaining order is appropriate. The first such category consists of those cases in which the employers' unfair labor practices are so "outrageous" and "pervasive" that "their coercive effects cannot be eliminated by the application of traditional remedies." Id. at 613-14, 89 S.Ct. at 1939-40 (internal quotations omitted). The second such category consists of "less extraordinary" cases in which the Board had undergone a detailed balancing resulting in the conclusion that "the possibility of erasing the effects of past practices and of ensuring a fair election ... by the use of traditional remedies ... is slight and that employee sentiment once expressed through cards would, on balance, be better protected by a bargaining order." Id. at 614-15, 89 S.Ct. at 1940-41.
 
 
 37
 Gissel, of course, involved a non-incumbent union and as such is not directly implicated here. This court, however, has required the Board to make detailed findings as to why a bargaining order is appropriate not only in cases involving non-incumbent unions, but also in cases involving incumbent unions. See, e.g., Exxel/Atmos, Inc. v. NLRB, 28 F.3d 1243, 1249 (D.C.Cir.1994); Caterair Int'l v. NLRB, 22 F.3d 1114, 1122-23 (D.C.Cir.1994); Sullivan Indus., 957 F.2d at 903; Peoples Gas Sys., Inc. v. NLRB, 629 F.2d 35, 46 (D.C.Cir.1980). But see NLRB v. Williams Enters., Inc., 50 F.3d 1280, 1289 (4th Cir.1995) (relying on incumbent/nonincumbent distinction in upholding Board's issuance of affirmative bargaining order without specific factual findings in case involving incumbent union).
 
 
 38
 In numerous cases, we have reminded the Board that a bargaining order is an "extraordinary remedy" that may not be imposed in run-of-the-mill cases. We have repeatedly held that if the Board wishes to impose an affirmative bargaining order, it must explain why that remedy is appropriate given the facts of that particular case. Caterair Int'l, 22 F.3d at 1123 ("Five times in the past fourteen years this court has remanded such orders to the Board with a request for explanation as to why, in the particular circumstances, the extra protection against decertification was necessary." (emphasis added)); Williams, 956 F.2d at 1237 ("The requirement that a bargaining order be accompanied by a reasoned explanation applies not only in election cases ... but also in cases like Peoples Gas where an employer withdraws recognition from an incumbent union. Under Peoples Gas, a bargaining order does not automatically flow from an unlawful withdrawal of union recognition. If the employer's violation is serious enough, a bargaining order might be appropriate despite concerns that the employees may not desire union representation ... But if the employer's violation is less serious, we would be inclined to give more weight to the employees' right to decide whether they want union representation and which union they want to represent them." (citations omitted)); Peoples Gas, 629 F.2d at 46 ("[W]hen ... a Company refuses to bargain with an incumbent Union, asserting a good faith doubt of Union majority support ..., before we will enforce a bargaining order, we must be able to determine from the Board's opinion (1) that it gave due consideration to the employees' section 7 rights ... (2) why it concluded that other purposes must override the rights of the employees to choose their bargaining representatives and (3) why other remedies, less destructive to employees' rights, are not adequate.").
 
 
 39
 Case law in our circuit is as clear as it could be on this question. The Board, however, continues to ignore us. We continue to reverse. See James J. Brudney, A Famous Victory: Collective Bargaining Protections and the Statutory Aging Process, 74 N.C. L.REV. 939 (1996) (discussing numerous examples of ongoing disagreements between the Board and federal appellate courts over interpretation of the Act).
 
 
 40
 In this case the Board did not make the particularized findings that our case law requires. The Board claims that the general explanations it offered in Caterair Int'l, 322 N.L.R.B. No. 11 (1996), and Williams Enters., 312 N.L.R.B. at 940-42, are sufficient. The Board's claim is disingenuous. Our case law is clear that the Board must explain why a bargaining order is required given the facts of the particular case. The Board has not done this. We therefore grant Lee's petition on this point and remand the case with instructions to either vacate the order or explain why an affirmative bargaining order is necessary given the facts of this case.
 
 
 41
 Without deciding the issue, we express serious doubt as to how the Board possibly could make a determination that a bargaining order was appropriate on the facts of this case. This entire incident arose seven years ago, the unfair labor practices in question were relatively slight, and the employees twice indicated that they were unhappy with the Union. This would seem to us to be a classic case where use of a bargaining order would force a union on unwilling employees. We leave it to the Board to consider this question on remand.
 
 CONCLUSION
 
 42
 Petitioner Lee Lumber has raised numerous challenges to the Board's handling of its case. We affirm the Board in all respects save for (1) its application of its "reasonable period of time" test to the facts of this case, and (2) its issuance of an affirmative bargaining order. On these issues we remand to the Board for further proceedings consistent with this opinion.
 
 SILBERMAN, Circuit Judge, concurring:
 
 43
 I remain of the opinion that this Circuit's line of cases on the Board's issuance of bargaining orders when an employer fails to bargain with an incumbent union is erroneous. Although several cases, including this one, recognize the difference between a Gissel situation and refusal to bargain with an incumbent union, our jurisprudence has been infected by the original case in this line, Peoples Gas, which did not. See Peoples Gas Sys., Inc. v. NLRB, 629 F.2d 35, 47 (D.C.Cir.1980). A bargaining order is not an extraordinary remedy in an 8(a)(5) case for the reasons that I have discussed in prior opinions, one of which was relied upon by the Fourth Circuit in accepting the Board's approach. See NLRB v. Williams Enterprises, 50 F.3d 1280, 1290 (4th Cir.1995); Exxel/Atmos, Inc. v. NLRB, 37 F.3d 1538, 1539-40 (D.C.Cir.1994) (per curiam) (Silberman, J., dissenting); Sullivan Indus. v. NLRB, 957 F.2d 890, 906-10 (D.C.Cir.1992) (Silberman, J., concurring in part, dissenting in part).
 
 
 44
 Be that as it may, I agree with my colleagues that the Board cannot so easily dodge the particularized finding requirement that we have imposed--albeit improperly--on the Board before it issues a bargaining order. The Board's "presumption" that a bargaining order is appropriate whenever an employer's illegal refusal to bargain antedates a manifestation of employee dissatisfaction with the union does not seem to me to be an abuse of its extensive remedial discretion--but of course I thought the same when the Board routinely issued such orders without explicitly basing them on a "presumption." Since our opinions, however, clearly require the Board to balance what we have described as the interests of the employees in a secret ballot election with a union and the Board's interest in remedying an unfair labor practice in light of the particular facts in every such case, the Board's "presumption" is simply a way to tell this Circuit to go fly a kite. I would have thought it more appropriate to have sought certiorari in one of the earlier cases. See, e.g., Exxel/Atmos, Inc. v. NLRB, 28 F.3d 1243 (D.C.Cir.), petition for reh'g denied, 37 F.3d 1538 (D.C.Cir.1994) (per curiam).
 
 
 45
 Even I, however, one of only two judges on this Circuit who have manifested toleration of the Board's policy, see Exxel, 37 F.3d at 1538, am dubious about a bargaining order in this case because it comes seven years after the crucial events and therefore seems quite stale. The delay, moreover, appears to be entirely the responsibility of the Board itself.
 
 
 46
 SENTELLE, Circuit Judge, concurring in part and concurring in the judgment:
 
 
 47
 I agree with much of what the court has to say, and I especially agree with the disposition of the bargaining order issue. I disagree only with the portion of the decision which upholds the Board's rule that an employer's refusal to bargain, even one so slight and void of malicious intent as the one the Board strains to find in the present case, is presumed to taint any subsequent loss of majority support by the union absent the highly unlikely "showing that employee disaffection arose after the employer resumed its recognition of the union and bargained for a reasonable period of time without committing any additional unfair labor practices that would detrimentally affect the bargaining." Supplemental Decision at 4.
 
 
 48
 I say "highly unlikely" because if the Board found a taint on the facts before it in this case, it would find one always. As Justice Scalia expressed in his dissent in NLRB v. Curtin Matheson Scientific, Inc., 494 U.S. 775, 812, 110 S.Ct. 1542, 1562, 108 L.Ed.2d 801 (1990) (Scalia, J., dissenting), an "underlying question" cannot be "altered by characterizing factual probabilities as presumptions." In the same case, Chief Justice Rehnquist, concurring, decried the Board's refusal to allow an "employer to resort to ... commonsense assumptions," in defending a good faith doubt about the continuance of majority support. Id. at 797, 110 S. Ct. at 1554 (Rehnquist, C.J., concurring). Also in that case, Justice Blackmun dissenting insisted that even in considering an agency's use or nonuse of a presumption, a "reviewing court ... must ask whether the agency's decision is the product of an adequate deliberative process and is consonant with other agency pronouncements in analogous areas." Id. at 800, 110 S.Ct. at 1556 (Blackmun, J., dissenting).
 
 
 49
 In the present case, the Board's use of the presumption that employees' otherwise free choice is all but irrefutably tainted when an employer has even slightly refused to bargain does not meet the standards any of these separate Justices would apply to determine if the Board has "give[n] objectively reasonable probative effect to the reality" of the facts before it. Id. at 808, 110 S.Ct. at 1560 (Scalia, J., dissenting).
 
 
 50
 As the court today notes in discussing the imposition of the bargaining order, "employee 'free choice' ... is a core principle of the [National Labor Relations] Act." Maj. Op. at 11 (citing Skyline Distribs. v. NLRB, 99 F.3d 403, 411 (D.C.Cir.1996)). However, in cases like the present one, the Board, in the face of that core principle, presumes that the employees are incapable of exercising their core right because they might have been deceived as to the union's strength by the employers' apparent willingness to challenge the union. If that is the case, and a union is worth having, then why couldn't the unions so inform the employees out of it? To presume that employees are such fools and sheep that they have lost all power of free choice based on the acts of their employer, bespeaks the same sort of elitist Big Brotherism that underlies the imposition of the invalid bargaining order in this case. Consider anew the facts before us. In 1990, 85.7 percent of the employees of the bargaining unit signed a petition asking for a chance to exercise their free choice. Seven years later, those employees still have not had the election they sought because the Board presumes that the employers' refusal for a few days to bargain with the Union thoroughly fooled those poor deluded employees to such a point that neither the Union nor anyone else could possibly educate them of the truth known only to their Big Brother, the Labor Board.
 
 
 51
 Consider for a moment a hypothetical world in which the supporters of a congressional candidate engage in illegal expenditures the day before an election. Their candidate ousts the incumbent by a few votes. Conceivably some hypothetical federal commission might, acting by delegation of Congress, someday have the power to set aside such an election. It is inconceivable that the people of the United States would tolerate empowering that commission to at the same time impose upon them the continuing services of the incumbent congressman for the next three and one-half congressional terms without a further election because of the presumed "taint" arising from the illegal expenditures. And yet, the Board feels perfectly righteous in so disenfranchising the employees in this case for the simple reason that they are employees. That is, the Board apparently has reasoned that the working class is composed of individuals not competent to determine their own best interest or even to know their own minds. I cannot in good conscience nor in obedience to my understanding of the role of a reviewing court support such administrative arrogance.