**HARTER TOMATO PRODUCTS COMPANY, Petitioner/Cross–Respondent,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent/Cross–Petitioner.**

No. 96–1326.

United States Court of Appeals, District of Columbia Circuit.

Argued Dec. 11, 1997.

Decided Jan. 23, 1998.

Warren Davison, Baltimore, MD, argued the cause for petitioner/cross-respondent With him on the briefs was Mary E. Bruno, San Francisco, CA.

David A. Seid, Attorney, National Labor Relations Board, Washington, DC, argued

the cause for respondent/cross-petitioner. With him on the brief were Linda Sher, Associate General Counsel, Aileen A. Armstrong, Deputy Associate General Counsel, and Fred Cornnell, Supervisory Attorney.

Before: WILLIAMS, HENDERSON and TATEL, Circuit Judges.

Opinion for the Court filed by Circuit Judge TATEL.

TATEL, Circuit Judge:

After a company which processed tomato paste, tomatoes, and other fruits halted operations, petitioner leased all of its facilities, continuing only tomato paste processing. Applying the successorship doctrine, the National Labor Relations Board found that petitioner committed an unfair labor practice by refusing to bargain with the union recognized by the predecessor. Agreeing with the Board that direct purchase of the predecessor's assets is not a prerequisite for successor status and finding that the Board's application of the successorship test is supported by substantial evidence, we deny the petition for review and grant the Board's cross-application for enforcement.

I

Harter, Inc., the predecessor company, processed industrial tomato paste, prunes, canned tomatoes, and canned peaches in Yuba City, California. Employing about 1200 people, Harter was a member of a multiemployer association that entered into a series of collective bargaining agreements with the International Brotherhood of Teamsters, an association composed of various labor organizations, including Cannery, Dried Fruit & Nut Workers' Union, Local 849.

In July 1993, Harter sold its facilities and equipment—including a tomato paste processing plant, a nonoperational whole peeled tomato canning plant, a building for processing peaches and prunes, and a warehouse—to a general partnership which then leased them to petitioner Harter Tomato Products Company ("HTPC"), a recently incorporated enterprise previously unrelated to Harter.

Through the lease, HTPC also obtained the right to use the "Harter" corporate name.

Like its predecessor, HTPC processes tomato paste, using the same equipment and production methods previously employed by Harter. Unlike Harter, HTPC processes no tomatoes, peaches, or prunes. During the 1993 season, HTPC employed about seventy people, two-thirds of whom had previously worked for Harter; it also employed seven former Harter managers—including its general manager, chief financial officer, and tomato processing plant manager—as its administrative team. Nearly sixty percent of HTPC's customers previously bought tomato paste from Harter. HTPC produced almost the same amount of tomato paste, making nearly the same amount of money from its tomato paste sales as Harter had in the previous year.

About two weeks after HTPC began processing tomato paste, the Union asked HTPC to recognize and bargain with it as the exclusive representative of HTPC's employees. HTPC refused. Instead, it filed a petition for a Board conducted election. The Board held HTPC's petition in abeyance because the day after the company filed it, the Union charged HTPC with violating sections 8(a)(1) and (5) of the National Labor Relations Act, 29 U.S.C. § 158(a)(1), (5) (1994), which prohibit employers from "refus[ing] to bargain collectively with the representatives of [their] employees." *Id.* § 158(a)(5). Some two weeks later, HTPC's employees signed a petition stating that they no longer wished to be represented by the Union.

On May 8, 1995, an Administrative Law Judge found that HTPC was a successor to Harter and had therefore violated the Act by refusing to bargain with the Union. Appealing to the Board, Harter argued that the successorship doctrine should not apply when the alleged successor merely leases the assets of the predecessor company, that the ALJ failed to consider important differences between the two companies in finding successor status, and that HTPC believed in good faith that a majority of its employees no longer supported the Union. The Board rejected all of these arguments. To begin with, it held that "the direct transfer of

assets to the successor is not a prerequisite to [successor] status" and that HTPC was "clear[ly]" a successor employer. *Harter Tomato Products Co.*, 321 NLRB 901, 901–02 (1996). In reaching this conclusion and analyzing the transition from Harter to HTPC from the employees' perspective, the Board found that HTPC "took over a distinct segment of Harter Inc.'s business, operating it in the same manner using the same equipment and the same employees, selling to many of the same customers, with no hiatus in operations." *Id.* at 903. The Board also found that HTPC's election petition and the employees' anti-union petition were "tainted by [HTPC's] unfair labor practice and ... not reliable indicators of the employees' sentiments." *Id.* at 903 n. 16.

▮ HTPC now petitions for review of the Board's order. The Board cross-applies for enforcement. We review the Board's factual conclusions for substantial evidence, *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 71 S.Ct. 456, 464–65, 95 L.Ed. 456 (1951), defer to NLRB rules if they are "rational and consistent with the Act," *Fall River Dyeing & Finishing Corp. v. NLRB*, 482 U.S. 27, 42, 107 S.Ct. 2225, 2235, 96 L.Ed.2d 22 (1987), and uphold the Board's application of law to facts unless arbitrary or otherwise erroneous, *Teamsters Local Union No. 515 v. NLRB*, 906 F.2d 719, 722 (D.C.Cir.1990).

## II

▮ The National Labor Relations Act's overriding purpose is the promotion of "industrial peace." *Brooks v. NLRB*, 348 U.S. 96, 103, 75 S.Ct. 176, 181, 99 L.Ed. 125 (1954). To achieve this goal, a union certified by the Board as a bargaining-unit representative enjoys a conclusive presumption of majority status for one year and a rebuttable presumption thereafter. *NLRB v. Burns Int'l Sec. Servs., Inc.*, 406 U.S. 272, 279 n. 3, 92 S.Ct. 1571, 1578 n. 3, 32 L.Ed.2d 61 (1972). An employer can rebut this presumption if on the basis of objective evidence, it has a good faith belief that the union no longer enjoys majority support. *Lee Lumber and Bldg. Material Corp. v. NLRB*, 117 F.3d 1454, 1458 (D.C.Cir.1997). Because transi-

tions from one employer to another are particularly threatening to industrial peace, the rebuttable presumption of majority status continues despite a change of employers. *Fall River*, 482 U.S. at 39–41, 107 S.Ct. at 2233–35. Moreover, "the new employer has an obligation to bargain with [the] union so long as the new employer is in fact a successor of the old employer and the majority of its employees were employed by its predecessor." *Id.* at 41, 107 S.Ct. at 2235.

▮ The successorship question turns on whether, in view of the "totality of the circumstances," there is "substantial continuity" between the new and predecessor employers. *Id.* at 43, 107 S.Ct. at 2236. More specifically—and central to this case—the Board asks whether the new company " 'acquired substantial assets of its predecessor and continued, without interruption or substantial change, the predecessor's business operations.' " *Id.* (quoting *Golden State Bottling Co. v. NLRB*, 414 U.S. 168, 184, 94 S.Ct. 414, 425, 38 L.Ed.2d 388 (1973)). To answer this inquiry, the Board must consider "a number of factors," including "whether the business of both employers is essentially the same; whether the employees of the new company are doing the same jobs in the same working conditions under the same supervisors; and whether the new entity has the same production process, produces the same products, and basically has the same body of customers." *Id.* at 43, 107 S.Ct. at 2236. The ultimate question is this: Will the employees "understandably view their job situations as essentially unaltered"? *Golden State Bottling*, 414 U.S. at 184, 94 S.Ct. at 425; *see also International Union of Petroleum & Indus. Workers. v. NLRB*, 980 F.2d 774, 779 (D.C.Cir.1992) ("The fact-intensive inquiry into 'substantial continuity' is undertaken with an emphasis on the employees' perspective.") (quoting *Fall River*, 482 U.S. at 43, 107 S.Ct. at 2236).

▮ Emphasizing *Fall River*'s use of the word "acquired," HTPC argues that it cannot be a successor because it only leased Harter's assets from a third party rather than purchasing them directly from Harter. Like the Board, we disagree. Nothing in the defi-

nition of "acquire"—"to come into possession, control, or power of disposal of often by some uncertain or unspecified means"—excludes leasing as a means of obtaining control. WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY OF THE ENGLISH LANGUAGE UNABRIDGED 18 (1993). Although we have never squarely addressed this question, two of our sister circuits have held that a direct purchase of assets is not a prerequisite for successorship. *See NLRB v. Houston Bldg. Serv., Inc.,* 936 F.2d 178, 180–81 & n. 2 (5th Cir.1991) (finding successorship when new company took over services contract of the predecessor but did not acquire predecessor's assets); *Saks & Co. v. NLRB,* 634 F.2d 681, 687 (2nd Cir.1980) ("[W]hile a transfer of assets may be evidence of the requisite continuity of business operations, it has not been thought to be a necessary condition . . . ."). HTPC's rigid definition of "acquired," moreover, conflicts with *Fall River*'s twin holdings that the Board must examine "a number of factors" when determining successorship and that the inquiry's touchstone is whether the employees perceive their job situations as essentially unchanged. *Fall River,* 482 U.S. at 43, 107 S.Ct. at 2236. We therefore hold that if other factors demonstrate substantial continuity and if employees perceive their new jobs as highly similar, the fact that the second company leased the assets of its predecessor from a third party rather than purchasing them directly from the predecessor does not preclude the Board from finding successorship status. *See id.* at 44 n. 10, 107 S.Ct. at 2237 n. 10 ("So long as there are other indicia of 'substantial continuity,' the way in which a successor obtains the predecessor's assets is generally not determinative of the 'substantial continuity' question.").

 HTPC next argues that the Board misapplied the successorship test, claiming that the agency " 'effectively disregarded' the substantial continuity prong of the successorship analysis." Again, we disagree. Drawing its factual findings from the parties' joint stipulation of facts, the Board faithfully applied *Fall River*'s multifactored successorship test, analyzing the results from the perspective of HTPC's employees. The Board found many factors weighing in favor of successorship: HTPC leased Harter's facilities,

used its equipment, engaged in tomato paste processing, employed the same production method as Harter, hired Harter's management team for similar positions, and sold to Harter's customers. A majority of HTPC's employees previously worked for Harter, and HTPC began its operation shortly after Harter went out of business. *Harter Tomato,* 321 NLRB at 902–03. Given these many similarities, we find the Board's successorship conclusion supported by substantial evidence and neither unreasonable nor arbitrary.

 Pointing to differences in size, wages, benefits, training, customer base, managerial philosophy, and supplier contracts, among others, HTPC argues that the two companies are substantially dissimilar and that HTPC's employees would perceive a material difference between the two. Though plausible, this argument is unresponsive to the question we face. We ask not whether HTPC's view of the facts supports its version of what happened, but rather whether the Board's interpretation of the facts is " 'reasonably defensible.' " *Pittsburgh Press Co. v. NLRB,* 977 F.2d 652, 654 (D.C.Cir.1992) (quoting *Ford Motor Co. v. NLRB,* 441 U.S. 488, 497, 99 S.Ct. 1842, 1849, 60 L.Ed.2d 420 (1979)). If so, the case is over, even if HTPC's version might support a contrary result. Because we find that the Board reached a reasonable conclusion based on evidence in the record, we need not consider HTPC's alternative interpretation. *See International Union of Elec., Radio & Mach. Workers v. NLRB,* 604 F.2d 689, 694–95 (D.C.Cir.1979) (internal organizational alterations do not preclude successorship finding when other factors are present).

### III

HTPC argues that, even if it were a successor, it had no obligation to recognize the Union (and that its election petition should proceed) because it had a good faith belief that the Union no longer enjoyed majority support among its employees. According to the Board, the employees' antiunion petition, on which HTPC primarily relies for its assertion of good-faith, was tainted by HTPC's

refusal to bargain. *Harter Tomato,* 321 NLRB at 903 n. 16. We have specifically upheld the Board's presumption that an employer's unlawful refusal to bargain taints a subsequent anti-union petition. *Lee Lumber,* 117 F.3d at 1458–59. We have also upheld its ruling that an employer can rebut this presumption only by showing that employee disaffection arose after it resumed recognition of the union and bargained for a reasonable time without committing additional unfair practices adversely affecting the bargaining, *id.* at 1458, a situation quite unlike this case.

 Relying on the Board's holding that the rebuttable presumption will not operate in "unusual circumstances," *Lee Lumber and Bldg. Material Corp.,* 322 NLRB 175, 178 & n. 24 (1996), *aff'd in part and remanded in part,* 117 F.3d 1454 (D.C.Cir.1997), HTPC argues that the presumption should not apply here because, among other reasons, "the size of the bargaining unit fluctuated radically within a short time." But HTPC failed to present this argument to the Board. Although the Board issued *Lee Lumber* approximately three weeks after its decision in this case, HTPC could have filed a petition for rehearing. Having failed to do so, it cannot present its argument here. 29 U.S.C. § 160(e) (1994) ("No objection that has not been urged before the Board ... shall be considered by [a reviewing] court [absent] extraordinary circumstances."); *Woelke &*

*Romero Framing, Inc. v. NLRB,* 456 U.S. 645, 665, 102 S.Ct. 2071, 2083, 72 L.Ed.2d 398 (1982).

 HTPC's final argument, that it had a good faith belief in the Union's nonmajority status because it leased Harter's assets and because its workforce was smaller than Harter's, suffers from the same defect. Although advancing this argument to the Board in general terms, HTPC never identified specific reasons for its good faith belief, contending only that this belief rested on "objective evidence" and "objective factors." Because HTPC failed to present this argument to the Board clearly enough, we cannot consider it now. *Consolidated Freightways v. NLRB,* 669 F.2d 790, 793 (D.C.Cir.1981) ("Cases interpreting section 10(e) look to whether a party's exceptions are sufficiently specific to apprise the Board that an issue might be pursued on appeal.").

We deny the petition for review and grant the Board's cross-application for enforcement.

*So ordered.*