Michael H. **HOLLAND**; Marty D. Hudson; Thomas F. Connors; Robert T. Wallace, as Trustees of the United Mine Workers of America 1992 Benefit Plan, Plaintiffs–Appellants,

v.

**NEW ERA COAL COMPANY, INC., Defendant,**

Mate Creek Development, Inc.; Sidney Coal Company, Inc., doing business as Clean Energy Company, Inc., Defendants–Appellees.

No. 97–6332.

United States Court of Appeals, Sixth Circuit.

Argued Feb. 5, 1999.

Decided June 4, 1999.

398

David W. Hupp, Linda J. Wallbaum (briefed), Segal, Sales, Stewart, Cutler & Tillman, Louisville, KY, Larry D. Newsome (briefed), Jonathan Sokolow (argued and briefed), UMWA Health & Retirement Funds, Office of the General Counsel, Washington, D.C., for Plaintiffs–Appellants.

W. Henry Jernigan, Jr. (briefed), Ellen S. Cappellanti (argued), Jackson & Kelly, Charleston, West Virginia, for Defendant–Appellee Mate Creek Development, Inc.

Donald P. Wagner (briefed), Stoll, Keenon & Park, Lexington, KY, Gregory B. Robertson (argued and briefed), Hunton & Williams, Richmond, Virginia, for Defendant–Appellee Sidney Coal Co., Inc.

Before: JONES and SUHRHEINRICH, Circuit Judges; ECONOMUS, District Judge.*

* The Honorable Peter C. Economus, United States District Judge for the Northern District of Ohio, sitting by designation.

## OPINION

SUHRHEINRICH, Circuit Judge.

Plaintiff trustees of a coal worker benefit plan appeal from the grant of summary judgment to two Defendant coal-mine operator employers on Plaintiffs' claim to collect payments for employee benefits from three Defendant employers under the Coal Industry Retiree Health Benefit Act of 1992, 26 U.S.C. §§ 9701–9722 ("Coal Act") (West Supp.1998).

The district court found that primary liability for the employee benefit plan contributions rested on New Era Coal Company, Inc. ("New Era"), a coal operator that signed the 1988 National Bituminous Coal Wage Agreement ("NBCWA") and employed the coal workers for whom Plaintiffs are requesting benefit plan contributions. The district court found that two subsequent coal-operators of the mine, Mate Creek Development, Inc. ("Mate Creek"), and Sidney Coal Company, Inc. ("Sidney Creek"), doing business as Clean Energy Mining Company ("Clean Energy"), were not liable to Plaintiffs for benefits under the Coal Act because they had not signed the NBCWA, were not successors-in-interest to New Era, and had not assumed any liability for New Era's contribution to the benefit plan. We **AFFIRM** the judgment of the district court.

Plaintiffs raise three issues on appeal: (1) whether a transfer of stock or assets is necessary to be a successor-in-interest or whether merely a substantial continuity under the totality of circumstances is sufficient; (2) whether a successor and a successor-in-interest as that term is used in the Coal Act are equally liable for retiree health benefits; and (3) whether the district court failed to consider the NLRB determination that Mate Creek was a successor-in-interest.

## I. BACKGROUND

### A. Factual

Sidney Creek is a subsidiary of the Massey Coal Company ("Massey"). On October 1, 1984, Sidney Creek purchased coal mines in eastern Kentucky from Carolina Power & Light Co. ("CPL"), and two of CPL's mining subsidiaries, Leslie Coal Mining Co., Inc. ("Leslie") and McInnis Coal Mining Company, Inc. ("McInnis"). The mines owned by Leslie and McInnis were operated under collective bargaining agreements with the United Mine Workers of America ("UMWA"). However, after Sidney Creek acquired the mines, neither Sidney Creek nor any other Massey company signed a collective bargaining agreement with the UMWA. The UMWA then struck Sidney Creek and the other non-signatory Massey companies and sued them for violating the existing NBCWA. The UMWA also sued Sidney Creek, Leslie, and McInnis for violating Article I of the NBCWA. During the strike, the McInnis mine was idle. To settle the strike in 1988, Sidney Creek paid $4,470,000.00 to the UMWA as benefits for the strikers. Sidney Creek also agreed for five years to select a contractor to operate the McInnis mine who would sign the 1988 NBCWA and hire from the strikers collectively referred to as the "Roberts panel."

On June 10, 1988, Sidney Creek contracted with New Era to mine coal at the former McInnis mine for a fee based on production. New Era was incorporated in 1988, was capitalized at $500, and had no other assets. New Era signed the 1988 NBCWA and hired from the Roberts panel. New Era then operated the McInnis mine from June 1988 until October 1991, using Sidney Creek's machinery, maps, and engineering services. Sidney Creek also paid the black lung excise tax for black lung benefits on behalf of New Era and some of New Era's legal fees.

In October 1991, New Era ceased operations and notified its employees that it was terminating their medical benefits. Sidney Creek and New Era executed an agreement for the "orderly transition" of the operation of the McInnis mine from New Era to Mate Creek. Mate Creek began

mining in November 1991, less than a month after New Era stopped. As with New Era, Sidney Creek supplied the equipment used by Mate Creek. Mate Creek also hired from the Roberts panel; in fact, all of the hourly employees that Mate Creek hired had previously worked for New Era. New Era even provided Mate Creek with its personnel files. Further, Mate Creek operated the McInnis mine in the same manner as New Era had operated it.

However, even though the 1988 Settlement Agreement required Sidney Creek to require an operator to sign an NBCWA, Mate Creek did not sign an NBCWA or any other agreement with the UMWA before it began mining. Mate Creek then unilaterally changed the terms and conditions of employment at the McInnis mine. The UMWA consequently filed unfair labor practice charges against Mate Creek with the National Labor Relations Board ("NLRB"). The NLRB found that Mate Creek was a successor to New Era, ordered Mate Creek to restore the previous terms and conditions of employment, and to pay its obligations to the employee benefit funds. After the NLRB determined that Mate Creek was a successor to New Era, Sidney Creek joined in a Settlement Agreement with the UMWA and Mate Creek to resolve the unfair labor practice claims. This Settlement Agreement did not alter the NLRB's determination that Mate Creek was New Era's successor. Under the Settlement Agreement, Mate Creek agreed to pay $1,000,000.00 to the UMWA and an additional amount to the UMWA 1974 Pension Trust. Mate Creek borrowed the money from a bank, and Sidney Creek guaranteed the loan. Further, Sidney Creek and Mate Creek contracted for Mate Creek to operate the Halfway Branch Mine, which Sidney Creek also owned, and to hire its former employees at the McInnis mine for the Halfway Branch mine. Mate Creek began mining at the Halfway Branch mine in September 1994 and stopped in January 1996.

After Mate Creek stopped mining at the McInnis mine, Sidney Creek doing business as Clean Energy, began mining at the McInnis mine. Sidney Creek as Clean Energy operated the McInnis mine as New Era and Mate Creek had operated it, using the same type of equipment, producing the same product, and selling it to the same customers. Clean Energy even hired six supervisors previously employed at the mine by Mate Creek and New Era. However, Clean Energy did not hire Mate Creek's other employees because Mate Creek had retained them to work at the Halfway Branch mine.

## B. Statutory

The Coal Act is the result of federal involvement in the coal industry that began in 1946. *See generally Blue Diamond Coal Co. v. Shalala (In re Blue Diamond Coal Co.),* 79 F.3d 516, 518–20 (6th Cir. 1996). The federal government assumed operation of the nation's coal mines during a prolonged strike by the UMWA against coal producers. The Krug–Lewis Agreement settled the strike and required coal producers to provide health and pension benefits to their workers. After the strike in 1947, the Bituminous Coal Operators Association, Inc. ("BCOA") and the UMWA collectively bargained for the first NBCWA which required the coal producers to contribute a production royalty to the UMWA Fund, a health benefit and pension fund. Health benefits were neither vested nor guaranteed. Coal producers were liable to the UMWA Fund only for their assigned royalties.

In 1974, benefits and funding changed. In light of the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. §§ 1001–1461 (1994), the UMWA Fund was divided into the 1950 UMWA Benefit Plan for older employees and the 1974 UMWA Benefit Plan for new employees (collectively the "1974 Funds"). Under this new funding scheme, the 1974 NBCWA provided increased benefits, in-

cluding lifetime health benefits. Later, however, the 1974 Funds became increasingly financially unstable because many coal producers went out of business or became non-union; many miners retired; and health care costs increased.

In 1989, the UMWA struck the Pittston Coal Company for ten months over retiree benefits. After the Pittston strike was settled, Congress enacted the Coal Act in 1992 to identify the payors most responsible for retirement health care benefits. The Coal Act consolidates the 1974 Funds into the Combined Fund and requires all coal operators that sign a NBCWA to contribute to the Combined Fund. *See* 26 U.S.C. §§ 9701(a)(5), 9702, 9704, and 9705. Under the Coal Act, beneficiaries under the 1974 Funds are assigned to current NBCWA-signatory coal operators based on the operators' obligations under their respective NBCWAs. *See* 26 U.S.C. §§ 9703(f), 9706. Eligible beneficiaries are first assigned to coal mine operators that (1) most recently employed the beneficiary for at least two years; and (2) signed a NBCWA in 1978 or later. *See* 26 U.S.C. § 9706(a)(1). If there is no such operator, a beneficiary is assigned to the operator that: (1) most recently employed the beneficiary; and (2) was a signatory to the 1978 or later NBCWAs. *See* 26 U.S.C. § 9706(a)(2). If there is no such operator, the beneficiary is assigned to the beneficiaries' longest pre–1978 signatory employer. See 26 U.S.C. § 9706(a)(3). For each beneficiary assigned to it, an operator pays a premium to the Combined Fund. *See* 26 U.S.C. § 9704(a). Each NBCWA signatory operator is also assessed for its proportional share of unassigned or "orphan" retirees. *See* 26 U.S.C. § 9704(d). Orphan retirees are eligible beneficiaries who are not assignable under 26 U.S.C. § 9706(a) because their former employers are defunct. *See* 26 U.S.C. §§ 9703(f), 9704(d). An operator's assigned share of orphan retirees, for assessing premiums, is proportional to its number of beneficiaries

assigned under 26 U.S.C. § 9706(a) to the total number of beneficiaries assigned to all operators under 26 U.S.C. § 9704(d), 9704(f)(1).

The Coal Act requires the 1992 Plan to provide certain minimal benefits. If a liable signatory operator does not pay its proportional beneficiary premiums, the liability is shifted, jointly and severally, to any related person to the operator. See 26 U.S.C. § 9712(d)(4). A related party includes a successor-in-interest. *See* 26 U.S.C. §§ 9701(c)(2)(A), 9711(g).

## II. DISCUSSION

■ Plaintiffs argue that Mate Creek and Sidney Creek/Clean Energy are successors-in-interest to New Era and therefore liable for retiree health benefits for New Era's former employees. Plaintiffs claim that the district court erred in holding that liability for retiree health care premiums as a successor-in-interest under the Coal Act requires the successor-in-interest to acquire the predecessor's assets or stocks.

■ The Coal Act imposes responsibility for funding multi-employer retiree health benefits on the parties most responsible for plan liabilities, i.e., the signatory coal operators that employed the coal worker, their related companies, and successors-in-interest. The Coal Act does not define the term "successor-in-interest." However, the term is used variously in the Internal Revenue Code ("I.R.C."), in which the Coal Act is codified, and in corporate common law. The case law construing successor-in-interest under the Coal Act is meager. A West Virginia district court held that the phrase "successor-in-interest" in the Coal Act has the same meaning as successor-in-interest in Treas. Reg. § 1.1503–2(c)(12), which deals with an acquiring corporation in a tax-free exchange that succeeds to the tax attributes of the selling corporation under I.R.C. § 381.[1]

---

1. Section 381 applies to transfer of assets

(I.R.C. § 368(a)(1)(D)), liquidations of 80%

*See UMWA 1992 Benefit Plan v. Leckie Smokeless Coal Co.*, 201 B.R. 163, 171 (S.D.W.Va.1996), *aff'd*, 99 F.3d 573 (4th Cir.1996); *accord, In re Lady H Coal Co., Inc.* 199 B.R. 595 (S.D.W.Va.1996). Based on this analysis, with which we agree, the term "successor-in-interest" requires some substantial or substantive transfer of ownership of assets or stock.

■ In contrast, Plaintiffs argue for a broad construction of "successor-in-interest" that does not necessarily require a transfer of stocks or assets but can rest on a substantial continuity of business operations. They assert that this approach is "consistent with the drafters' view that it is more appropriate to assign the cost of providing these benefits to ongoing business entities which have or had a relationship with the signatory employer than to tax totally unrelated entities to fund the contractually promised benefits." 138 Cong. Rec. S17566–01, 17603 (daily ed. Oct. 8, 1992)(Conference Report). Plaintiffs contend that a common-law, multi-factor definition of "successor-in-interest" should be used, as it is used to interpret statutes with purposes similar to the Coal Act. Plaintiffs rely on *EEOC v. MacMillan Bloedel Containers, Inc.*, 503 F.2d 1086 (6th Cir.1974), which adopted a nine-factor test in determining successorship under the National Labor Relations Act:

> Courts that have considered the successorship question in a labor context have found a multiplicity of factors to be relevant. These include: 1) whether the successor company had notice of the charge, 2) the ability of the predecessor to provide relief, 3) whether there has been a substantial continuity of business operations, 4) whether the new employer uses the same plant, 5) whether he uses the same or substantially the same work force, 6) whether he uses the same or substantially the same supervisory personnel, 7) whether the same jobs exist under substantially the same working conditions, 8) whether he uses the same machinery, equipment and methods of production and 9) whether he produces the same product.

*Id.* at 1094.

However, even under *Bloedel's* common-law, multi-factor analysis, it is not clear that Mate Creek and Sidney Creek as Clean Energy are successors-in-interest to New Era. New Era, Mate Creek, and Clean Energy are simply independent coal operators who successively operated the McInnis mine under contract with Sidney Creek, the owner of the McInnis mine. New Era, Mate Creek, and Clean Energy did not contract with the previous contract coal operator for the right to operate the mine or to use the coal mining equipment. Mate Creek did not acquire any stock or assets, merge with New Era, nor assume any obligations of New Era. Mate Creek hired many of New Era's former employees because Mate Creek hired them from the same union labor pool. Mate Creek also did not know of New Era's liability for retiree health benefits because Mate Creek started operating before the Coal Act was passed in 1992. Clean Energy is not a successor-in-interest to Mate Creek for similar reasons.

Plaintiffs also claim that the Coal Act uses successor and successor-in-interest interchangeably. However, the Coal Act actually distinguishes between successor and successor-in-interest in assigning liability for retiree health benefits. The Coal Act imposes liability for retiree health benefits on: signatory operators, related persons, 1988 agreement operators, last signatory operators, and assigned operators. *See* 26 U.S.C. § 9701(c)(1). A "related person" includes a successor-in-interest to any of the members of the controlled

owned subsidiaries (I.R.C. § 332), statutory mergers and consolidations (I.R.C. § 368(a)(1)(A)), nominal changes in corporate organization (I.R.C. § 368(a)(1)(F)), exchange of assets for voting stock (I.R.C.368(a)(1)(C)), transfer of substantially all assets between companies under common control, transfers of assets for stock of acquiring corporation related corporations in a bankruptcy reorganization (I.R.C. § 368(a)(1)(G)).

group of corporations or other legal entities. *See* 26 U.S.C. § 9701(c)(2)(A). Similarly, 26 U.S.C. § 9711(g)(1) provides: "The term 'last signatory operator' shall include a successor in interest of such operator." Therefore, a successor-in-interest is liable for retiree health benefits insofar as a related person or last signatory operator is liable.

However, the Coal Act treats the term successor quite differently. Section 26 U.S.C. § 9711(g)(2) specifies that a last signatory operator "may transfer liability" for the benefits to a successor, but that the last signatory operator remains liable as a guarantor of the benefits. If a successor and successor-in-interest were synonymous, then 26 U.S.C. § 9711(g)(2) would be surplusage because a successor-in-interest already would be statutorily liable for retiree health benefits under 26 U.S.C. § 9711(g)(1), which includes successor-in-interest within the term last signatory operator. However, if successor and successor-in-interest are not synonymous, then 26 U.S.C. § 9711(g)(2) would not be surplusage. Under a plain reading, a successor's liability for retiree health benefits would depend on whether the last signatory operator transferred its liability to the successor.

Thus, even without defining the terms successor and successor-in-interest, the Coal Act clearly treats successors and successors-in-interest differently. The Coal Act imposes liability for employee-benefit contributions on successors-in-interest, but does not similarly impose liability on successors. At most, New Era, Mate Creek, and Clean Energy are successive operators of the McInnis mine. Mate Creek and Clean Energy are not successors-in-interest to New Era because they have no substantial or substantive connection with each other as would be evidenced by a transfer of stocks or assets.

■ Plaintiffs also claim that the district court erred in not deferring to the determination of the NLRB that Mate Creek was a successor to New Era. The district court did not err in not deferring to the NLRB's determination because the NLRB determined successorship for purposes of collective bargaining, not for determining liability of retiree health benefits. *See NLRB v. Burns Intern. Sec. Services*, 406 U.S. 272, 92 S.Ct. 1571, 32 L.Ed.2d 61 (1972) (holding that although successor-in-interest became liable for none of predecessor's obligations, successor-in-interest nevertheless had duty to bargain with union under the NLRA). Similarly here, there was no purchase of assets and stocks or assumption of any obligations among New Era, Mate Creek, and Clean Energy. They were merely successive operators of the same mine, with no other substantial connection among them.

### III. CONCLUSION

We hold that liability for contributions to an employee benefit fund as a successor-in-interest requires a transfer of the predecessor's assets or stocks. Accordingly, we **AFFIRM** the judgment of the district court.