**Michael H. HOLLAND,**
**et al., Appellants,**

v.

**WILLIAMS MOUNTAIN COAL COMPANY, *d/b/a* Naoma Coal Company, and Augusta Processing, Inc., Appellees.**

**No. 00–7072.**

United States Court of Appeals,
District of Columbia Circuit.

Argued April 6, 2001.

Decided July 31, 2001.

Peter Buscemi argued the cause for appellants. With him on the briefs were Stanley F. Lechner, David W. Allen and John R. Mooney. Charles P. Groppe entered an appearance.

Gregory B. Robertson argued the cause for appellees. With him on the brief were Susan F. Wiltsie, Mary Lou Smith and Charles L. Woody.

Before: WILLIAMS, SENTELLE and HENDERSON, Circuit Judges.

Opinion for the Court filed by Circuit Judge STEPHEN F. WILLIAMS.

Concurring opinion filed by Circuit Judge SENTELLE.

STEPHEN F. WILLIAMS, Circuit Judge:

Under the Coal Industry Retiree Health Benefit Act of 1992 (the "Coal Act" or "Act"), 26 U.S.C. §§ 9701–9722 (1994), the duty of paying premiums for the health benefits of certain retired miners falls on the "last signatory operator." *Id.* § 9711(a). For the six miners whose benefits are involved here, it is undisputed that Toney's Branch Coal Company was that operator. But Toney's Branch is bankrupt. The Act also imposes the duty on any "successor in interest" of the last signatory operator. *Id.* § 9711(g)(1). Defendant firms Augusta Processing and Williams Mountain never employed any of the six miners, but right after the withdrawal of Toney's Branch they successively operated Shumate Eagle mine (where Toney's Branch had employed the six miners), using other miners who had worked at Shumate Eagle for Toney's Branch, and equipment previously used by Toney's Branch at the mine. The sole issue before us is whether Augusta and Williams Mountain can on that account be held liable as "successors in interest" of Toney's Branch.

\* \* \*

From 1991 until September 1994 Toney's Branch, a "contract mining" firm, mined coal from Shumate Eagle under contract with the mine's owner. In September 1994 the mine owner terminated the contract with Toney's Branch and sold the mine. The new owner contracted with Augusta to operate the mine, which it did until October 1995. Augusta used equipment that it had purchased, in an arm's length transaction, from an affiliate of To-

ney's Branch. In October 1995 Williams Mountain bought the mining equipment from Augusta and took up the mining operation. Neither Augusta nor Williams Mountain ever held an ownership interest in Toney's Branch, or vice versa. Meanwhile, Toney's Branch continued mining operations elsewhere, until its demise in bankruptcy.

Plaintiffs are trustees of the 1992 United Mine Workers of America ("UMWA") Benefit Plan ("1992 Plan"). The Plan was established under the Act, as part of Congress's response to the failure of certain coal companies to pay the health benefits they promised their miners. Under successive National Bituminous Coal Wage Agreements ("NBCWAs") between the coal operators and the UMWA, companies had agreed to pay benefits not only for their workers but also for workers whose employers had failed to meet their obligations under the agreement, so-called orphaned workers. *R.G. Johnson Co. v. Apfel*, 172 F.3d 890, 892 (D.C.Cir.1999). A considerable number of operators responded by withdrawing from the Agreement, either to continue mining with nonunion employees or to leave the coal business altogether. See *Eastern Enters. v. Apfel*, 524 U.S. 498, 511, 118 S.Ct. 2131, 141 L.Ed.2d 451 (1998). The result was a spiral of increasing obligations for the remaining signatories, and increasing withdrawal. *Id.* In response, Congress sought to assign health care liability in a form that would be free from such unraveling. *Id.* at 513–14, 118 S.Ct. 2131.

The plaintiff trustees are obligated to provide benefits for retirees who are entitled to benefits under § 9711 (including the six involved here) but who are not receiving them. 26 U.S.C. § 9712(b)(2)(B). If they cannot compel payment by the last signatory operator, a related person, or a "successor in interest," they can adjust the premiums they charge employers obliged to contribute to the 1992 Plan. *Id.* § 9712(d)(2)(B). Thus there is no chance of the miners being denied their benefits. The only issue is whether the expenses will be borne by defendants or by the broad class of coal operators obliged to fund the 1992 Plan. The trustees contend that defendants Augusta and Williams Mountain are "successors in interest" within the meaning of § 9711(g)(1) and therefore responsible for the charges. The district court disagreed and granted summary judgment for defendants. We affirm.

\* \* \*

■ The trustees urge a broad definition of successors in interest, namely the "substantial continuity of operations test." This is a multi-factor inquiry that examines, among other things, the ability of the predecessor to provide relief; whether the new employer had notice of potential liability; whether he uses the same plant, equipment and workforce; and whether he produces the same product. See, e.g., *Secretary of Labor v. Mullins*, 888 F.2d 1448, 1453–54 (D.C.Cir.1989). Under this standard, the companies may well be successors in interest to Toney's Branch: Toney's Branch is now bankrupt, the Act is familiar to all coal operators, and the companies seamlessly took over operations at Shumate Eagle.

Against this the companies urge narrower definitions, drawn both from general corporate law and from federal tax law (noting that the Act is in fact embedded in Title 26, the Internal Revenue Code ("I.R.C.")). *Black's Law Dictionary* (6th ed.1990), for example, provides the standard corporate law definition:

In order to be a "successor in interest", a party must continue to retain the same rights as original owner without change in ownership and there must be change

in form only and not in substance, and transferee is not a "successor in interest." ... In case of corporations, the term ordinarily indicates statutory succession as, for instance, when corporation changes its name but retains same property.

*Id.* at 1283–84 (citations omitted). In the alternative, the companies suggest a definition from the I.R.C. that shares with the corporate law definition the element of commingled ownership. See 26 CFR § 1.1503–2A(c)(3)(vii)(B); 26 U.S.C. § 381. Under both of these definitions the "successor in interest" is a successor to the *wealth* of the predecessor, typically through a corporate reorganization. A party simply acquiring property of a firm in an arm's length transaction, and taking up its business activity, does not become the selling firm's "successor in interest." Under both definitions the companies are plainly not successors in interest of Toney's Branch, and we need not here wrestle with which of them is to be preferred in the event of a clash.

Because both sides assume that federal law controls the meaning of "successor in interest," we do the same. See generally *Atchison Topeka & Santa Fe Ry. v. Brown & Bryant, Inc.*, 159 F.3d 358, 362–64 (9th Cir.1998).

At the outset the trustees' proposed reading of § 9711(g)(1) encounters difficulty from the adjacent statutory language. While § 9711(g)(1) mandates that "successors in interest" share liability with last signatory operators, § 9711(g)(2) permits "successors" to assume by contract liability for health benefits owed to retirees. The natural reading is that Congress intended "successors" in subsection (g)(2) to include a broad class of persons, e.g., firms that take over mining operations from others, and are *not* liable as a matter of law, but assume liability by contract with the seller

to suit the mutual convenience and risk-allocation preferences of the contracting firms. If § 9711(g)(1) imposed liability by law on virtually all potential candidates for the (g)(2) transaction, the latter would, for the most part, be surplusage. See *Holland v. New Era Coal Co.*, 179 F.3d 397, 403 (6th Cir.1999).

The trustees respond that, because the section heading for § 9711(g)(1) is "Successor," Congress intended the terms "successor" and "successor in interest" to be used interchangeably. For them the only role of § 9711(g)(2), as against subsection (g)(1), is to allow successors to contract for *primary* responsibility. But, quite apart from the customary reluctance to give great weight to statutory headings, see, e.g., *Bhd. of R.R. Trainmen v. Baltimore & Ohio R.R. Co.*, 331 U.S. 519, 528–29, 67 S.Ct. 1387, 91 L.Ed. 1646 (1947), it seems very odd to use a heading, which normally is a kind of shorthand, to justify stripping the actual text of two words, "in interest," that were obviously included deliberately.

This conclusion accords with the structure of the Act. Section 9711 specifies two groups that share liability with last signatory operators: related parties and successors in interest. Related persons, defined in § 9701(c)(2)(A), encompass members of a controlled group of corporations including the signatory operator in question, a business under common control with the signatory operator, and a person in a partnership or joint venture with the signatory operator in the coal business. A common feature of all such entities is that they share ownership or comparable economic interests with the signatory operator. Understanding successor in interest as embodying the standard corporate concept gives it a closely congruent meaning.

We note that the Internal Revenue Service has promulgated definitions of "suc-

cessor in interest" for various specific purposes. See, e.g., 26 CFR § 1.1503–2A(c)(3)(vii)(B); *id.* § 301.6110–2(*l*); *id.* § 302.1–1(e). See also *In re Leckie Smokeless Coal Co.*, 99 F.3d 573, 585 n. 14 (4th Cir.1996). Because of the variety of definitions we question whether the term can be said to have received the sort of consistent treatment that led the Supreme Court in *Commissioner v. Keystone Consolidated Industries, Inc.*, 508 U.S. 152, 113 S.Ct. 2006, 124 L.Ed.2d 71 (1993), to infer, for the phrase "sale or exchange," an intent to incorporate a previously "settled" meaning. *Id.* at 159, 113 S.Ct. 2006. But we also note that the trustees do not claim that *any* of the definitions chosen by the IRS in other contexts is broad enough to sweep in the two coal companies here.

■ In sum, then, the text and structure of § 9711 point powerfully toward the two companies' position. The trustees, however, brush aside this textual analysis and offer three arguments to support a broad definition of successors in interest. First, they contend that the Act is a remedial statute and therefore should be liberally construed. This is meaningless. All statutes seek to remedy some problem, so the maxim does nothing to identify what statutes should be "liberally construed" (assuming that phrase to have a discrete meaning). *E. Bay Mun. Util. Dist. v. U.S. Dep't of Commerce*, 142 F.3d 479, 484 (D.C.Cir.1998); *Ober United Travel Agency, Inc. v. U.S. Dep't of Labor*, 135 F.3d 822, 825 (D.C.Cir.1998).

Second, trustees argue that broad successor liability fits Congress's stated intent to assign the duty of paying premiums "to persons most responsible for plan liabilities." 26 U.S.C. § 9701 note (Findings and Declaration of Policy) (quoting § 19142 of Pub.L. No. 102–486). For our purposes Congress here selected the last signatory operator, Toney's Branch, the last firm to receive benefits from the six miners' labor. After that the Act assigns liability to related persons, § 9711(b), and to successors in interest, § 9711(g)(1). What the trustees fail to explain is why companies such as the two here—whose only link to the six miners is to have started mining operations with equipment bought from Toney's Branch, after the six retired, at the mine where the six had formerly worked—are in any material respect more "responsible" for plan liabilities for the six than is the broad class of firms funding the 1992 Plan. The defendants' arm's length purchase of mining equipment at the Shumate Eagle mine seems to tie them to the six miners no more than would any firm's purchase of any assets (office equipment, real property, etc.) from Toney's Branch. The set of operators that would bear the premiums for the six miners' benefits under the 1992 Plan, however, are all signatories to the 1988 NBCWA, whereby they have promised to fund the benefits of orphan retirees. THE SECRETARY OF LABOR'S ADVISORY COMMISSION ON UNITED MINE WORKERS OF AMERICA RETIREE HEALTH BENEFITS, COAL COMMISSION REPORT 27 (Nov.1990). The Coal Act merely enforces these promises. 26 U.S.C. § 9712(d).

Even if Congress's purpose were recast in more general terms—securing health benefits for retired miners, see, e.g., 26 U.S.C. § 9701 note (Findings and Declaration of Policy)—broad successor liability is hardly essential to that goal. The six miners will receive benefits regardless of whether the defendants are billed for them. To address the concern that in the absence of successor liability the scheme set up by the Act might collapse as last signatory operators sold off assets, pocketed the money, and declared bankruptcy, the Act itself expressly denies effect to any transaction of which a "principal purpose

... is to evade or avoid liability." 26 U.S.C. § 9722. The bankruptcy laws similarly provide relief against fraudulent transfers. See, e.g., 11 U.S.C. § 548. Nor is it the case that lack of successor liability would discourage some conduct Congress sought to encourage; this contrasts (for instance) with the Multiemployer Pension Plan Amendments Act ("MPPAA") of 1980, where courts have been concerned that without broad successor liability firms would be discouraged from joining preexisting multi-employer pension agreements. See *Upholsterers' Int'l Union Pension Fund v. Artistic Furniture of Pontiac*, 920 F.2d 1323, 1329 (7th Cir. 1990). Here the classes of both beneficiaries and ultimate obligors is substantially fixed. Not only does the Act apply solely to miners who retired by September 30, 1994, 26 U.S.C. § 9712(b)(2), but it legally obligates their employers, if they have signed a 1988 NBCWA, to provide benefits, *id.* §§ 9712(d), 9701(c)(3).

■ The trustees' final argument is that courts have often used the substantial continuity test to determine successor liability in federal statutes (particularly those adopted for the protection of employees), even when those statutes include no language directly supporting liability for successors of any kind. Because statutory interpretation proceeds on the assumption that Congress's choice of words reflects a familiarity with judicial treatment of comparable language, *Traynor v. Turnage,* 485 U.S. 535, 545–46, 108 S.Ct. 1372, 99 L.Ed.2d 618 (1988), we cannot say, without some consideration of the cases using substantial continuity, that the trustees' claim is *a priori* wrong. In reality, however, courts have adopted that standard only in the presence of certain factors, the most notable of which, at least, is palpably missing here.

■ Before presenting our core objections to the trustees' argument, we review, for context, the origins of the substantial continuity test. Under the traditional rule on corporate successorship liability, a corporation that acquires manufacturing assets from another corporation does not thereby assume the liabilities of the seller. The rule admits four exceptions: (1) when the successor expressly or impliedly assumed those liabilities; (2) when the transaction may be construed a de facto merger; (3) when the successor may be considered a "mere continuation" of the predecessor; and (4) when the transaction was fraudulent. See *Mozingo v. Correct Mfg. Corp.,* 752 F.2d 168, 174 (5th Cir. 1985) (citing 15 William Meade Fletcher, *Fletcher Cyclopedia of the Law of Private Corporations,* § 7122 (Perm. ed.1983)). Most relevant for our purposes is the "mere continuation" exception. Traditionally, this applies when, after the transfer of assets, there is an identity of stock, stockholders, and directors between the purchasing and selling corporations. See, e.g., *Weaver v. Nash Int'l, Inc.,* 730 F.2d 547, 548 (8th Cir.1984). Thus the "mere continuation" exception appears to closely parallel the basic "successor in interest" concept invoked by Augusta and Williams Mountain.

As the Third Circuit has observed, the traditional rule concerning the liability that attaches to asset sales was "designed for the corporate contractual world," and "protects creditors and dissenting shareholders, and facilitates determination of tax responsibilities, while promoting free alienability of business assets." *Polius v. Clark Equipment Co.,* 802 F.2d 75, 78 (3rd Cir.1986). But it is also generally applied in cases involving tort plaintiffs, see, e.g., *id.* at 82–83; *Travis v. Harris Corp.,* 565 F.2d 443, 446 (7th Cir.1977), and the beneficiaries of federal statutes, see, e.g., *Atchison Topeka & Santa Fe Ry.,* 159 F.3d at

364 (Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA")), even though such parties may have had no real opportunity to protect their interests by contract with the predecessor corporation. For their protection some courts have stretched the "mere continuation" test into the substantial continuity of operations test advocated by the trustees, see *Polius,* 802 F.2d at 78 (noting cases); *Cyr v. B. Offen & Co.,* 501 F.2d 1145, 1152–54 (1st Cir.1974). The majority, however, still follow the traditional rule in tort cases, see *Polius,* 802 F.2d at 80 (products liability); RESTATEMENT (THIRD) OF TORTS: PRODUCTS LIABILITY § 12 cmts. a, b (1997), and in cases involving federal statutes such as CERCLA, see *Atchison, Topeka & Santa Fe Ry.,* 159 F.3d at 364.

In the context of federal statutes whose primary beneficiaries are employees, however, it appears that most courts invoke the substantial continuity test. This departure from the traditional rule was sparked by four Supreme Court cases, two involving disputes under the National Labor Relations Act ("NLRA"), *Golden State Bottling Co. v. NLRB,* 414 U.S. 168, 94 S.Ct. 414, 38 L.Ed.2d 388 (1973); *NLRB v. Burns Int'l Security Servs., Inc.,* 406 U.S. 272, 92 S.Ct. 1571, 32 L.Ed.2d 61 (1972), and two the Labor Management Relations Act ("LMRA"), *Howard Johnson Co. v. Detroit Local Joint Executive Bd., Hotel & Rest. Employees & Bartenders Int'l Union,* 417 U.S. 249, 94 S.Ct. 2236, 41 L.Ed.2d 46 (1974); *John Wiley & Sons, Inc. v. Livingston,* 376 U.S. 543, 84 S.Ct. 909, 11 L.Ed.2d 898 (1964). Neither statute mentions successors, let alone successors in interest. *Steinbach v. Hubbard,* 51 F.3d 843, 845 (9th Cir.1995). Yet, proceeding under principles of equity, the Court in each case addressed the extent to which successors to the originally liable firm's operations could be lawfully burdened with promises entered or statutory torts committed by their predecessors. The Court weighed congressional interest in the policy promoted by the statute, and the extent to which successor liability would promote it, against the cost and inequity to the successor of imposing liability. See, e.g., *Golden State,* 414 U.S. at 184, 94 S.Ct. 414; *Burns Int'l,* 406 U.S. at 287–88, 92 S.Ct. 1571.

Although the four cases concerned the core labor relations statutes, the reasoning has been used to find broad successor liability under other statutes that govern employees' rights whether they explicitly address successor liability, *Leib v. Georgia–Pacific Corp.,* 925 F.2d 240, 244–45 (8th Cir.1991) (Vietnam Era Veterans' Readjustment Assistance Act of 1974 ("VEVRAA")); *Vanderhoof v. Life Extension Inst.,* 988 F.Supp. 507, 512–13 (D.N.J.1997) (Family Medical Leave Act) (relying on NLRA and Title VII case law), or not, *Wheeler v. Snyder Buick, Inc.,* 794 F.2d 1228, 1235–36 (7th Cir.1986) (Title VII); *Musikiwamba v. ESSI, Inc.,* 760 F.2d 740, 745–46 (7th Cir.1985) (Civil Rights Act of 1866). In none of these cases, however, did the text and structure of the underlying legislation point firmly against successor liability based on substantial continuity of operations. The four Supreme Court cases that provide authority for these cases, for example, interpreted a pair of statutes that, unlike the statute before us, failed to give guidance on successor liability one way or the other. Moreover, even pursuing this line of cases would leave our conclusion unchanged.

A key factor motivating courts to extend successor liability beyond the textual bounds of a statute is that the victim of the predecessor's behavior may be left without a remedy unless recourse against the successor is allowed. *Musikiwamba,* 760 F.2d at 746. (This is, of course, ordinarily

an aspect of Congress's intent.) The relief sought under the statutes involved in the *Howard Johnson-Golden State* line of cases is *typically* "nonmonetary and can be effective only if directed against the workers' current employer." *EEOC v. G–K–G, Inc.*, 39 F.3d 740, 748 (7th Cir.1994) (Age Discrimination in Employment Act ("ADEA")); see, e.g., *Harter Tomato Prods. Co. v. NLRB*, 133 F.3d 934, 936–37 (D.C.Cir.1998) (successor's duty under NLRA to bargain with union for predecessor's employees); *Leib*, 925 F.2d at 247 (successor's duty under VEVRAA to re-hire predecessor's employee); *Criswell v. Delta Air Lines, Inc.*, 868 F.2d 1093, 1094 (9th Cir.1989) (successor's duty under ADEA to rehire predecessor's worker and change mandatory retirement policy); *Bates v. Pac. Maritime Ass'n*, 744 F.2d 705, 710–11 (9th Cir.1984) (successor's duty to obey Title VII consent decree requiring a certain level of representation of blacks among workforce at a harbor). Even if the remedy sought by the plaintiff in a particular case is simply damages, the possibility that other plaintiffs suing under the same statute may seek injunctive relief supports successor liability under that statute. *G–K–G*, 39 F.3d at 748. But the Coal Act contemplates no specific performance remedies. 26 U.S.C. § 9711(a); see also *id.* §§ 9704(a), 9712(d). Because (1) only pure money cases may be brought, (2) the "successor in interest" standard of corporate law allows the beneficiary (or the 1992 Plan trustees) to pursue the *wealth* of the last signatory operator, and (3) the Coal Act as a whole assures protection for the beneficiary without his incurring the costs and risks of pursuing a departed past employer, there is no warrant whatever for broad successor liability.

Thus we reject the trustees' claim that § 9711(g)(1) adopts the "substantial continuity of operations" test. As we observed before, the two companies prevail here under either of their candidates—the general corporate definition or one of the special tax definitions, see, e.g., 26 CFR § 1.1503–2A(c)(3)(vii)(B); 26 U.S.C. § 381. Accordingly we may leave to another day the resolution of any differences in detail between these and possibly other candidates.

The judgment of the district court is

*Affirmed.*

SENTELLE, Circuit Judge, concurring:

I concur completely in the result reached by the majority and its basic textual analysis of the Coal Industry Retiree Health Benefit Act of 1992 ("Coal Act"), 26 U.S.C. §§ 9701–22. This analysis alone is sufficient to support the outcome reached by the majority; the remainder of the opinion is obiter dicta. I write separately because I fear the majority's discussion of the trustees' final argument—that we should adopt a broad substantial continuity test—may be misleading. The cases from our sister circuits that have "extend[ed] successor liability beyond the textual bounds of a statute" are in no way relevant to our analysis in this case. Opinion at 825. While it is fashionable in some legal circles to deride "hyper-technical reliance upon statutory provisions," *Palm Beach County Canvassing Bd. v. Harris*, 772 So.2d 1220, 1227 (Fla.), *vacated*, 531 U.S. 70, 121 S.Ct. 471, 148 L.Ed.2d 366 (2000), this Court does not—and should not—move in them.

The majority cites the Supreme Court's decision in *Traynor v. Turnage*, 485 U.S. 535, 545–46, 108 S.Ct. 1372, 99 L.Ed.2d 618 (1988), for the proposition that we must assume that "Congress's choice of words reflects a familiarity with judicial treatment of comparable language." Opinion at 824. In fact, the *Traynor* Court assumed that by using a specific term in a veterans' benefits statute, Congress "intended that the term receive the same meaning for

purposes of that statute as it had received for purposes of other veterans' benefits statutes." 485 U.S. at 546, 108 S.Ct. 1372. In other words, the Court stated that statutory terms should be interpreted in the same way in statutes covering similar topics—not in any statute covering any topic. *Cf. Del Commercial Props., Inc. v. Commissioner*, 251 F.3d 210, 218 (D.C.Cir. 2001).

In the present case, this maxim of statutory interpretation suggests that the term "successor in interest" in the Coal Act should be interpreted consistently throughout the Internal Revenue Code, *see Commissioner v. Keystone Consol. Indus.*, 508 U.S. 152, 159, 113 S.Ct. 2006, 124 L.Ed.2d 71 (1993), and that Congress was aware of how the term had been interpreted in that context, *see Traynor*, 485 U.S. at 546, 108 S.Ct. 1372. Treasury Regulations define "successor in interest" as "an acquiring corporation that succeeds to the tax attributes of an acquired corporation" through the following transactions: the liquidation of a subsidiary, a merger or consolidation, the sale of "substantially all of the properties of another corporation" for voting stock, 26 U.S.C. § 381, or the mere change of identity. 26 C.F.R. § 1.1503–2A(c)(3)(vii)(B). Relatedly, state business association law historically has been used to determine the tax liability of "a successor corporation for the debts of its predecessors." 15 MERTENS LAW OF FEDERAL INCOME TAXATION § 61.17, at 47 (2000); *see also United States v. First Dakota Nat'l Bank*, 137 F.3d 1077, 1079–80 (8th Cir. 1998); *Atlas Tool Co. v. Commissioner*, 614 F.2d 860, 870 (3d Cir.1980); *George v. Commissioner*, 2000 WL 1545066 (T.C. Oct. 19, 2000) (mem.). In West Virginia, where both the defendant companies are incorporated, a corporation that purchases the assets of another corporation is not liable for the debts of the seller unless: (1) the purchaser expressly or impliedly assumes the liability, (2) the transaction was fraudulent, (3) "some element of the transaction was not made in good faith," (4) the purchase effected a consolidation or merger, or (5) "the successor corporation is a mere continuation or reincarnation of its predecessor." *Jordan v. Ravenswood Aluminum Corp.*, 193 W.Va. 192, 455 S.E.2d 561, 563 (W.Va.1995); *see also West Texas Ref. & Dev. Co. v. Commissioner*, 68 F.2d 77, 80 (10th Cir.1933) (applying the same factors in a tax dispute). Under either of these formulations, the defendant companies would not be liable under the Coal Act. This analysis is sufficient to affirm the district court's decision in this case.

If Congress had sought to adopt something similar to the trustees' articulation of the substantial continuity of operations test it likely would have done so explicitly. For example, the Black Lung Benefits Act holds companies liable for benefit payments to coal-mining employees when the companies are successive operators of a coal mine or acquire substantially all of the assets of the previous operator. *See* 30 U.S.C. § 932(i)(1). Of course, in the Coal Act, Congress did not adopt this approach.

The majority's lengthy discussion of cases employing the substantial continuity of interest test does not clarify "judicial treatment of comparable language." Opinion at 824. As the majority recognizes, courts largely have adopted this test in cases when the statute at issue does not address successorship, much less use the term "successor in interest." *See, e.g., Wheeler v. Snyder Buick, Inc.*, 794 F.2d 1228 (7th Cir.1986).

The majority rightly traces this analysis to four Supreme Court decisions. Two of these decisions dealt with claims brought under the Labor Management Relations Act (LMRA), and two arose from decisions issued by the National Labor Relations

Board (NLRB) pursuant to the National Labor Relations Act (NLRA). In the first of the LMRA decisions, *John Wiley & Sons, Inc. v. Livingston,* 376 U.S. 543, 544, 84 S.Ct. 909, 11 L.Ed.2d 898 (1964), the Supreme Court addressed whether a successor company was required to comply with an arbitration clause in a collective bargaining agreement between a union and the predecessor company. Significantly, the predecessor corporation had merged with the successor corporation, and the Court was confronted with a question of "contractual origin"—and therefore did not interpret or apply any statute. *See id.* at 545, 546, 550–51, 84 S.Ct. 909. Construing the contract and noting the "substantial continuity of identity in the business enterprise" following the merger, the Court held that the successor corporation was required to comply with the arbitration clause. *Id.* at 551, 84 S.Ct. 909. Later, the Court explained that the *Wiley* "holding dealt with a merger occurring against a backdrop of state law that embodied the general rule that in merger situations the surviving corporation is liable for the obligations of the disappearing corporation." *NLRB v. Burns Int'l Sec. Servs., Inc.,* 406 U.S. 272, 286, 92 S.Ct. 1571, 32 L.Ed.2d 61 (1972).

In the second LMRA case, *Howard Johnson Co. v. Detroit Local Joint Executive Board,* 417 U.S. 249, 251–52, 94 S.Ct. 2236, 41 L.Ed.2d 46 (1974), a franchiser bought all of the personal property associated with a franchisee's business operation, but did not retain the franchisee's employees. The employees' union claimed that the franchiser was required to "arbitrate the extent of its obligations" to the employees under the collective bargaining agreement between the franchisee and union. *Id.* at 253, 94 S.Ct. 2236. The Court held that the franchiser was not bound by the agreement because it did not have a "substantial continuity of identity" with the

franchisee. *Id.* at 264, 94 S.Ct. 2236. The *Howard Johnson* Court contrasted the circumstances of the case with *Wiley,* emphasizing that *Wiley* "involved a merger, as a result of which the initial employing entity disappeared." *Id.* at 257, 94 S.Ct. 2236. In *Howard Johnson,* however, "the initial employers remain in existence as viable corporate entities." *Id.* Significantly, in neither *Wiley* nor *Howard Johnson* did the Supreme Court purport to interpret the LMRA—or any statute—to encompass any successorship doctrine.

Unlike *Wiley* and *Howard Johnson,* the Court in *Golden State Bottling Co. v. NLRB,* 414 U.S. 168, 171–72, 94 S.Ct. 414, 38 L.Ed.2d 388 (1973), and *NLRB v. Burns Int'l Sec. Servs., Inc.,* 406 U.S. at 277, reviewed the Board's interpretation of its organic statute. When reviewing such decisions, the Court employs a deferential standard, upholding the Board's interpretation of the NLRA as long as it "adopts a rule that is rational and consistent with the Act." *Fall River Dyeing and Finishing Corp. v. NLRB,* 482 U.S. 27, 42, 107 S.Ct. 2225, 96 L.Ed.2d 22 (1987); *see Golden State Bottling Co.,* 414 U.S. at 181, 94 S.Ct. 414 (considering "whether the Board properly exercised its discretion" in ordering a bona fide purchaser of a business to reinstate employees with backpay when the predecessor corporation had engaged in unfair labor practices); *Burns Int'l Sec. Servs.,* 406 U.S. at 278–79, 92 S.Ct. 1571 (holding that "it was not unreasonable" for the NLRB to hold that the successor employer is required to bargain with an existing certified union). Indeed, "[i]n *Burns* [the Supreme Court] approved the approach taken by the Board and accepted by the courts with respect to determining whether a new company was indeed the successor to the old." *Fall River,* 482 U.S. at 43, 107 S.Ct. 2225. That approach, as the majority explains, is the broad totality

of the circumstances test that the trustees now advocate. *See id.*

In previous cases, this Court has affirmed the use of the substantial continuity of interest standard to determine the obligations of successor corporations—but only when reviewing an agency decision that had employed it. For example, in *Harter Tomato Prods. Co. v. NLRB*, 133 F.3d 934, 938 (D.C.Cir.1998), we upheld the NLRB's conclusion that a company that merely leased assets from a predecessor company could still be a successor required to bargain with an existing union if it met the broad substantial continuity test. *See also Pa. Transformer Tech., Inc. v. NLRB*, No. 00–1388, slip op. at 4–5 (D.C.Cir. June 29, 2001). Our decision was based on the deference we accord to NLRB rules that are "rational and consistent" with the NLRA. *Harter Tomato*, 133 F.3d at 937 (internal quotation omitted). Similarly, we deferred to the Federal Mine Safety and Health Review Commission when it used the test to determine successor liability under the Mine Safety and Health Act. *See Secretary of Labor v. Mullins*, 888 F.2d 1448, 1451 n. 10, 1453–54 & n. 15 (D.C.Cir.1989). Our deference to reasonable statutory interpretations made by agencies to which Congress has specifically delegated authority should not be confused with an adoption of those interpretations or a belief that they are correct. We have never interpreted a statute *de novo* and concluded that liability under the statute is determined based on a substantial continuity of interest.

In contrast, some courts have adopted the substantial continuity standard when interpreting statutes *de novo*. In doing so, they have relied on the four Supreme Court decisions discussed above—even though the cases before them did not review an agency decision, did not focus on labor contracts, and did not even deal with statutes that mention successorship. This reliance is mistaken.

The Supreme Court has never adopted any amorphous totality-of-the-circumstances test in cases raising successorship questions not arising in a context requiring deference to an agency. Instead, it has stated that there must be a "substantial continuity of identity in the business enterprise," which "necessarily includes . . . a substantial continuity in the identity of the work force across the change in ownership." *Howard Johnson Co.*, 417 U.S. at 263, 94 S.Ct. 2236 (citation omitted). Even if this language could be read with the breadth some of our sister circuits suggest, the Supreme Court has only applied it in cases dealing with current employees seeking to establish a company's obligations under an existing collective bargaining agreement, and then only has found such a continuity when two companies have merged, one of those companies has been extinguished, and all of the predecessor's employees have been retained by the successor company. Furthermore, nothing in either *Howard Johnson* or *Wiley* can be read to extend the reach of their holdings beyond their "contractual origin," much less beyond statutes governing labor-management relations.

The courts that have morphed the substantial continuity standard of *Howard Johnson* and *Wiley* into a sweeping totality-of-the-circumstances standard have allowed rules adopted by the NLRB pursuant to its authority under the National Labor Relations Act, *see, e.g., Fall River*, 482 U.S. at 43, 107 S.Ct. 2225, to serve as the law for other statutes well outside the NLRB's reach. *See, e.g., Musikiwamba v. ESSI, Inc.*, 760 F.2d 740, 750 (7th Cir. 1985). It is the role of Congress, not the judiciary, to establish when successors should be held liable for the statutory violations of predecessor companies and

whether successors have obligations to their predecessor's former employees. *See Wheeler v. Snyder Buick, Inc.,* 794 F.2d 1228, 1237 (7th Cir.1986). Courts simply should not extend liability "to a variety of statutory contexts when the equities have so dictated" no matter how "important" the policy they seek to fulfill. *Upholsterers' Int'l Union Pension Fund v. Artistic Furniture of Pontiac,* 920 F.2d 1323, 1327 (7th Cir.1990). When Congress seeks to establish broad rules of successor liability, it will do so on its own. *See, e.g.,* 30 U.S.C. § 932(i)(1). Under the Coal Act, it did not. Insofar as the majority's opinion by discussion of the "factor[s] motivating courts to extend successor liability beyond the textual bounds" of statutes suggests any legitimacy for that approach, I wish to make plain that that is not the holding of this case, nor the analysis that commands my concurrence.